WESTERN UNION TELEGRAPH CO. v. EYSER.

PLEADING — *nul tiel corporation.* A defendant sued as a corporation cannot deny its own existence, either in abatement or in bar. If it is not a corporation, it cannot, as such, appear and plead.[*]

CONTRIBUTORY NEGLIGENCE — *in case against a telegraph company*, to recover for injuries resulting from the act of defendant's servants in suspending a wire over and across a public street in a city, the plaintiff's right to recover is not affected by his having contributed to his injury, unless he was in fault in so doing.

*Therefore, the charge* that it must appear " that the culpable negligence of the plaintiff did not contribute to occasion such injury ; that is to say, that the plaintiff himself did not, on the occasion complained of, omit to exercise such effort and caution to avoid the accident and injury as a man of ordinary prudence and circumspection, placed in the same circumstances, would have exercised, was correct."

CORPORATIONS — *liable in tort as natural persons.* Corporations are liable in actions of tort in the same way, and to the same extent, as natural persons, and exemplary damages may be awarded against them in such actions.

*Exemplary damages for gross negligence.* In an action against a telegraph company to recover damages resulting from an injury occasioned by the gross negligence of defendant's servants, exemplary damages may be awarded.

NEGLIGENCE — *degrees of.* The distinction formerly observed as to slight, ordinary and gross negligence is of doubtful utility.

*What is gross.* But, however that may be, if a telegraph company, engaged in constructing its line through a public and frequented street of a city, allow its wire to remain suspended across the street in a manner which obstructs travel, without guards, flags, or other notice to the public of the obstruction, it is guilty of gross negligence.

INSTRUCTIONS TO THE JURY — *as to gross negligence.* The evidence being submitted to the jury to find the facts upon which gross negligence is predicated, they may be instructed to award exemplary damages, proportioned to the nature and extent or character of the injury.

PRINCIPAL AND AGENT — *acts of officers of corporations.* Evidence showing that

---

[*] See *The Mud Creek Draining Co.* v. *The State ex rel. Morley et al.,* 43 Ind. 236.

a telegraph line was put up by the direction of persons acting as superintendents of defendant's lines, and that it was paid for by one of such persons, and subsequently used by the company, will support a finding that the work was done by defendant, and that the persons employed were acting within the scope of their authority, although there was some evidence to show that a railroad company was also interested in the line.

ORDINANCES — *to show streets, and upon question of negligence.* In an action against a telegraph company, to recover for injuries resulting from an obstruction placed in a street of a city by the servants of the company, ordinances of the city are admissible evidence to show:

1. That the place obstructed was a public street.

2. That such obstruction was forbidden by law, and hence, that the company was guilty of negligence.

## *Appeal from District Court, Arapahoe County.*

THE action was on the case, and the plaintiff alleged that on the 18th of April, 1870, the defendant, being a body corporate, was engaged in constructing a telegraph line along F street and across Blake street, which were public thoroughfares in the city of Denver; that at and near the corner of said F and Blake streets, the said defendant, its agents, servants and superintendents, unlawfully, wrongfully, and without proper and due care and diligence, placed, stretched and strung a wire across said Blake street at the height of eighteen inches above the level of said street, and that said wire was permitted to remain in that position for the space of one hour, during which time the plaintiff riding along said street on horseback, with reasonable care and speed, became entangled in the said wire and was thrown from his horse and seriously wounded and injured and thereby disabled for two months to his damage, etc.

The defendant pleaded, 1st. The general issue; 2d. That the defendant was not at the commencement of the suit, nor at time of the committing of the supposed grievances, and is not now a corporation as alleged; 3d. That at the time of the supposed grievances, the said plaintiff was riding carelessly, negligently, etc., and that the injuries occurred through his misconduct, and not by the fault of the defendant; 4th. That the city of Denver was, by its charter, charged with the care and control of its streets, and that the

city was primarily liable to plaintiff. A demurrer was sustained to the second, third and fourth pleas, and the trial was upon the general issue. The third and fourth pleas were not noticed in argument or in the opinion of the court.

As to the party or persons by whom the line was constructed, but one witness testified at the trial, and his testimony upon that point is given entire. B. F. Woodward having stated that he had knowledge of the line, also stated the work was being done by a force under Geo. J. Washburn. Washburn, I suppose, was under my charge. Difficult to say for whom I was then acting ; can't answer that to my own satisfaction. The labor of putting up wire was paid for by me, and I was reimbursed by money from St. Louis from R. C. Clowrey.

Can't say who Clowrey acted for in paying this. I reported to Clowrey expenses incurred in building wire. Did so at direction of Hibbard of Omaha. I had suggested to Hibbard that I could, to advantage, use a force here to expedite building this line. A party was already building it from the east, and General Palmer had suggested his sending wire and insulators to Denver, if I'd make up a party here. I laid the matter before Hibbard, and received telegram to proceed. Hibbard was over me as superintendent of the third district of the Western Union Telegraph Company. He directed me to report to Clowrey. I did make the report to Clowrey in pursuance of that instruction. Clowrey settled the bill. I had already received the money covering these expenses. I received it from Clowrey by express. Some part of the money was sent through Mr. Johnson (of the Artesian well at Kit Carson). Don't know in what capacity Clowrey was acting. Hibbard's jurisdiction did not extend to this territory. I am under jurisdiction of Hibbard, but not under Clowrey. There was authority from Hibbard to me to do something outside of his district. Know Clowrey is superintendent of second district, because I have understood so. At this time I had charge of the second division of third district of defendant's

lines—that embraced the city of Denver.  Had been acting for the defendant in that capacity for about a year ; not before that in that capacity, but in another capacity.  I had charge of Denver office previous to that for a few years. Have had charge of the interests of the defendant in Denver since October, 1863, in one capacity and another.  After the wire was erected, it was operated very soon after—two or three weeks.  It was operated mainly by operators of railroad company.  We had the wire in our office.  The operators in my office operated it there.  Whatever proceeds there may have been, went into the general receipts of defendant's office in the city of Denver.  I was present at the time of the erection of the wire near the crossing of F and Blake ; saw the erection of a portion of it.

Several questions were here asked the witness concerning a paper alleged to be a copy of a contract between the Union Pacific Railroad Company Eastern division, and defendant.  Nothing was drawn out respecting the contents of the contract, nor was the contract itself put in evidence. It will be observed that the court did not regard the objections to the questions as material, because neither the contract or its contents were put in evidence.  The witness afterward stated :  Two or three weeks after the erecting of this wire the proceeds of it, if any, went into general account of the office of defendant here, of which I am in charge.  The proceeds are still—that is any pay business we send over that line—goes into the general receipts of that office—if we send any pay business over that line—think there has been pay business sent on the line since its erection.  That particular line was taken down shortly after the completion of the railroad.  So long as it was operated this condition of things continued  The line was taken down by a force sent here from the east; don't know particularly who sent them ; have no positive knowledge as to Mr. Clowery's official position.  I have corresponded with him and addressed him as superintendent of the second district ; have had such correspondence for the last two and a half or three years ; that correspondence was by letter and telegram.

The telegrams may have been sent over defendant's lines. We send messages over any line that is working. I cannot say that I have ever sent any myself ; have addressed messages to him and put them on file, and they have been sent either by way of Omaha or Kansas City ; such messages may have been sent half a dozen times ; can't say how often ; the line by way of Omaha is part of defendant's line ; think the line was operated both by the Denver office of defendant and by the Construction Company of the Kansas Pacific Railroad Company.

On cross-examination the witness stated that he sold General Palmer seventy-five or eighty miles of wire; that it was put up for the benefit of the Construction Company of the Kansas Pacific Railroad Company. I never heard any objection to its being used by our company. The wire was run into two offices in Denver. Till it was taken down that wire was the wire of the railroad company. Hibbard was superintendent of the third district. I know this only because I communicated with him as such. I suppose my appointment comes indirectly through Hibbard. The appointment was made by Hibbard through the recommendation of his superior officer, General Stager. Hibbard's general authority wouldn't extend into the territory when the wire was put up. His authority only extends to Denver city. It included Denver city. My authority as general superintendent didn't authorize me to erect this line then—my authority is only to look after the general interests of the company within a specified district. I have the employment of operators and the general charge of officers in the sub-district and also the general repairs of the line. As superintendent of the district I have no control over this wire furnished by the Kansas Pacific Railroad, excepting that as a rule all branch offices are subject to the principal office in the city where located, and if I knew of any violation of the rules of the company by operators in General Palmer's office, it would be my duty to report it to the officers of the company, though I might not have any authority to report it. Defendant here asked :

Q. "You state Clowrey was superintendent of the second district in which this wire was ; how do you know this, of your own knowledge or by hearsay ?

A. "I never saw his credentials; I only know he is recognized as such; I have no positive knowledge that defendant recognized him as such; I supposed him to be such; when I speak of two lines on which I corresponded with Crowley, I mean the two lines by way of Omaha and on the Kansas Pacific Railroad; I suppose the line on the Kansas Pacific Railroad was built by that company; I know that I sold wire to General Palmer for the line on the Kansas Pacific Railroad; the insulators were sent from the east; General Palmer made the contract for the poles; don't know who sent the insulators, at least, who paid for them; that part of the line from Cheyenne to Omaha is the defendants'; that part of the line from Cheyenne to Denver belongs to the United States and Mexico Telegraph Company; this line was taken down by a party coming from the east; I have no positive knowledge who paid the expense; I suppose I know; the wire was taken down by George Macy who was the line builder and repairer; it was taken down by nobody in my employ; it was taken down in order to change the route; the line was built originally for some distance east of Denver on wagon road, and when the railroad was completed, a line was finished through on that and then this wire was taken down and piled up at the junction of the Kansas Pacific Railroad; the wire taken down was the same I sold; a portion of it; no positive knowledge as to Palmer's relation to railroad company; he acted as superintendent of construction.   Upon re-examination, witness stated that he had no positive information as to who employed Macy; he also stated that he supposed the defendant operated the line because the railroad company had no power to maintain a commercial line.   He also stated :

We operated it and received proceeds, furnished battery for operating line, and operated it by permission of the railroad company.   Arrangement with Palmer for building line was that I should set a party to work to build from

Denver eastward. It was in pursuance of this arrangement that wire was being put up at corner Blake and F streets, April 18, 1870.

The plaintiff also gave in evidence that he was riding on Blake street in the city of Denver, on a gentle pony in an ordinary trot, and that when he came to F street his horse became entangled in a telegraph wire and became unmanageable and fell with him ; that he was thrown upon the ground and received injuries from which he was at first insensible ; that some of his teeth were broken out, blood was discharged from the mouth, and that a contusion was inflicted upon the right knee and thigh, from which he suffered for a period of two months; that his thumb was dislocated; that he was prevented from attending to his ordinary business for a period of forty days, and was compelled to use crutches; that he incurred a physician's bill of $150, which he had promised to pay, but had not paid. As to the speed at which plaintiff was riding at the time of the accident, several witnesses testified that the horse was going in an ordinary trot, and others stated that he was in a gallop, and that the horse appeared to be unbroken, and quite unmanageable. It was also in evidence that Washburn and Woodward were engaged in putting a telegraph wire upon poles, at the crossing of Blake and F streets, and that, at the time of the accident, the wire was suspended eighteen inches or two feet above the level of the street, to which position it had been elevated shortly before plaintiff came that way; that men were then engaged in raising the wire to the tops of poles, which were placed for the purpose of supporting it; that there was no unnecessary delay in getting the wire up; that there were no guards or signals of danger to the public at or near the wire, although persons in that vicinity called out to plaintiff, as he approached. Plaintiff himself testified that he heard such call just as he struck the wire, but not in time to stop or avoid it; that Blake street, at the point where the accident occurred, was a public thoroughfare, much used and frequented; as much as any place in the city.

Pursuant to 49th section of the charter of the city of Denver (5 Sess. 103), the published ordinances of the city were offered and received in evidence. And section 1 of an ordinance concerning streets and alleys was read, which prohibits any person from obstructing any street or alley with any building material or other thing, without first having obtained the permission of the mayor; also, a certain other ordinance fixing and establishing the grade of Blake and F streets.

The defendant presented eighteen prayers for instructions, none of which were given in the language used by him. Error was assigned upon the refusal of the court to give the following :

1. That the burden of proof is upon the plaintiff to show, not only that the defendant was guilty of negligence, but that he himself was not guilty of negligence or carelessness, before he can recover.

2. That, if the jury believe, from the evidence, that the injury to the plaintiff in this case was the result of the fault or negligence of the plaintiff, or of the fault or negligence of both the plaintiff and defendant, without any intention on the part of defendant, then the plaintiff cannot recover, and the jury must find for the defendant.

3. That the defendant in this case, being a corporation, is only held liable for ordinary care and diligence for the acts of its agents or servants, and if the jury believe, from the evidence in this cause, that ordinary care and diligence was used in putting up the wire at the time and place where the accident occurred, the jury should find for the defendant.

4. If the jury believe, from the evidence, that the plaintiff in this cause contributed to bring about the accident in this cause, by his own negligence or want of care, then they must find for the defendant, even though they should believe, from the evidence, that the defendant had also been guilty of negligence or want of ordinary care.

5. That, before the defendant can be held liable for the injury complained of in this case, it was incumbent on the plaintiff to prove that the persons engaged in stretching the wire across Blake street were the servants or agents of the defend-

ant, and, as such agents or servants, were acting within the scope of their authority at the time of the accident, and, if the fact has not been satisfactorily shown to the jury, they should find for the defendant.

6. That the fact that Mr. Woodward was superintendent of the defendant, in charge of the defendant's line of telegraph south of Cheyenne, and the defendant's office in Denver, is not sufficient to show an authority from the defendant to construct and stretch a wire across Blake street, at the time of this accident, and that, in this case, to fix the liability of the defendant, it should have further appeared in evidence that Mr. Woodward was acting within the scope of his authority in the construction of this work, and further, that the jury cannot infer an authority from this defendant to Woodward to order the stretching of the wire across Blake street, from the fact that he was the general superintendent of the defendant, in charge of its line south of Cheyenne, and its office in Denver.

8. If the jury believe, from the evidence, that the plaintiff received warning, no matter from what source, in time, so that a prudent man in the exercise of ordinary care and diligence could have averted the accident and failed to do so, then he himself is at fault, and the jury should find for the defendant.

9. That before the plaintiff can recover in this action he must show that he was exercising ordinary care and diligence himself to avoid accidents, and if the jury believe, from the evidence, that such ordinary care and diligence was not used by him, or that he was riding at such a gait and in such a manner as to render it impossible to avoid danger when warned of it in time, or that his horse was unmanageable by reason of such gait and manner of riding, or for any other cause, the jury will find for the defendant.

12. That under the pleadings in this case it is necessary for the plaintiff to prove that the defendant is a corporation, and if the plaintiff has failed to prove this fact, they will find for the defendant.

The court charged as follows :

In order to entitle the plaintiff to a verdict in this case it is incumbent upon him to establish :

1. That the injuries complained of by him resulted directly from the negligence of the servants or agents of the defendant while engaged in doing what was within the scope of their authority and agency to do.

2. That the culpable negligence of the plaintiff did not contribute to occasion such injury : that is to say, that the plaintiff himself did not, on the occasion complained of, omit to exercise such effort and caution to avoid the accident and injury, as a man of ordinary prudence and circumspection placed in the same circumstances would have exercised.

Before the jury can find that the persons who erected the wires were the agents of the defendant and acting within the scope of their authority, the jury must be satisfied by the evidence that the said persons had been before the time thereof directed or employed to erect said wires by the agents or officers of the defendant, or some of them, having authority to direct the construction of lines of wire within the district containing the city of Denver. If the jury believe, from the evidence, that the persons who erected the wires had not such original authority, then, there being no evidence in the case which will warrant the inference of a subsequent ratification by defendant, the jury must find for the defendant.

3. If the jury believe that those who erected the wires had authority from defendant in the first instance, and that said wires were erected in a negligent manner, and that the injuries complained of by plaintiff resulted in any degree from this negligence, then the jury will also consider whether the plaintiff was guilty of culpable negligence which contributed to produce such injuries.

4. And if the injury complained of resulted without negligence of the defendant or from the negligence of the defendant, and the culpable negligence of the plaintiff, as above defined, combined, the plaintiff cannot recover.

5. If, before the alleged accident, the plaintiff was called to, or warned, by persons standing near the vicinity, whether

employees of the defendant or not, and the call or warning was so definite as to apprise him of the existence and locality of the obstructions alleged to have occasioned the injury, and came in such time that the plaintiff, by the exercise of such care and effort as a man of ordinary prudence in the same circumstances would have exercised, might have escaped the injury complained of, and if, notwithstanding such warning, the plaintiff continued his progress, then the plaintiff was guilty of culpable negligence.

6. In determining whether plaintiff was, or was not, guilty of culpable negligence, the jury may consider the rate or gait at which plaintiff was riding at the time and place at which the accident is alleged to have occurred, and whether, with reference to that time and place, the rate at which plaintiff was riding was, or was not, immoderate or unreasonable.

If plaintiff was riding at a rate which a man of ordinary prudence would not have ridden at that place and time, and if riding at no faster rate than a man of ordinary prudence at that time and place would have ridden, plaintiff might have escaped the injury complained of, then plaintiff was guilty of culpable negligence.

7. But if the plaintiff was riding at a rate not faster than a man of ordinary prudence and circumspection would have ridden at that time and place, and notwithstanding the warning alleged to have been given could not have checked his speed by the exercise of such exertion as a man of ordinary prudence would have exercised upon the same warning and in the same circumstance, then the plaintiff was not guilty of culpable negligence in omitting to heed such warning.

8. In determining whether plaintiff was or was not guilty of culpable negligence contributing to the injury complained of, the jury may also consider whether the horse ridden by plaintiff was well broken and manageable, or otherwise.

9. If the plaintiff was riding an unbroken or unmanageable horse in a crowded thoroughfare, and the accident to plaintiff resulted from the inability of plaintiff to check his speed by reason of such unmanageability, and if the plain-

tiff, after the alleged warning given, might, by the exercise of such effort as a man of ordinary prudence would have exerted under like circumstances, have checked his speed, had the horse been a well broken and manageable horse, then the plaintiff cannot recover.

10. If the defendant's agents and servants, acting within the scope of their authority from defendant, were engaged in constructing a telegraph line in the city of Denver, and in such construction stretched a wire across one of the public and frequented streets of said city during the hours of the day when such streets are wont to be so frequented, and suffered such wire to remain stretched across said street, and elevated such distance above the ground as to obstruct or entangle the feet of a horse passing upon said street, for the space of one-half minute to a longer period, and if, unless such wire was of such size and character as to be easily seen by persons approaching at a moderate speed, defendant's agent omitted to station flag, sentinels or other sufficient means of warning, to warn or notify passers by of the place where such wire was stretched ; or if defendant's agents did station such sentinels, and they failed to give warning to plaintiff, then the defendant was guilty of negligence ; and if from such negligence the injury complained of occurred without culpable negligence on the part of plaintiff contributing thereto, then the jury ought to find for the plaintiff, and in fixing the plaintiff's damages, should compensate the plaintiff not alone for his actual loss in the loss of time during his confinement, or disability, if any, resulting from the alleged accident, but may award exemplary damages proportioned to the nature and extent or character of the injury. And all circumstances of aggravation or extenuation attending the alleged negligence of defendant, and the extent of such damages, is to be measured by the sound discretion of the jury in view of all the circumstances, but such damages are not to exceed the damages laid in the declaration, $10,000.

11. The jury will not allow, in estimating the actual damages sustained by plaintiff, the expenses incurred or for

which plaintiff has become liable for the medical attendance of the witness McClellan.

12. The jury will consider the ordinances of the city of Denver, read before them only for the purpose of ascertaining whether the streets called Blake and F streets were or were not at the time of the alleged accident public highways.

The defendant assigned error in this court upon the second, third, seventh and tenth of the foregoing instructions

Messrs. CHARLES & ELBERT, for appellant.

Mr. N. HARRISON and Messrs. BROWNE & PUTNAM, for appellee.

BELFORD, J. This was an action on the case instituted by the appellee against the appellant to recover damages for injuries sustained by the appellee by reason of the negligence of the appellant in the construction, erection and establishment of a line of telegraph through and over a portion of the city of Denver and across Blake street. The defendant filed four pleas : 1st. The general issue. 2d. *Nul tiel* corporation. 3d and 4th pleas set up that the injury was occasioned by the contributory negligence of the plaintiff. A demurrer was sustained to the second, third and fourth pleas, and the case was tried on the general issue. A verdict for the plaintiff for $5,000. Motion for new trial overruled. Judgment on the verdict and appeal.

It is claimed first that the court erred in sustaining the plaintiff's demurrer to the defendant's second, third and fourth pleas.

It is no objection to a plea which is well pleaded in other respects that the matter of it may be given in evidence under the general issue. The right to plead as many pleas as a defendant may deem necessary for his defense is secured by statute. In so pleading, however, it is not his privilege to incumber the record with tautologous allegations, nor with pleas which while they pretend to be special amount only to a denial of the plaintiff's allegation. Where a plea

amounts simply to the general issue, and when the matters
set up in it may be given in evidence under the general
issue, the usual course is to strike such plea from the files
on motion. It has been held, however, by some respectable
courts that a general demurrer will also be sustained. *Cur-
tis* v. *The Central Railroad Co.*, 6 McLean, 401.

Any matter of defense which denies what the plaintiff on
the general issue would be bound to prove, may and ought
to be given in evidence under the general issue, and a plea
setting up negatively such facts is bad. *Bank of Auburn*
v. *Weed*, 19 Johns. 302. But any ground of defense
which admits the facts alleged in the declaration, but avoids
the action, by matter which the plaintiff would not be bound
to prove or dispute in the first instance on the general issue,
may be pleaded specially. Evidence that the plaintiff's
negligence contributed to the injury sued for may be given
in evidence under the general issue. *Indianapolis Railroad
Co.* v. *Rutherford*, 29 Ind. 82 ; *Bridge* v. *Grand Junction
Railroad Co.*, 3 M. & W. 244. If the negligence of the
plaintiff did contribute to the injury, that was a fact to be
proved by the defendant. *Railroad* v. *Glodman*, 15
Wall. 401. I therefore see no objection to the ruling of the
court on the demurrer as to third and fourth pleas. The sec-
ond plea—that of *nul tiel* corporation—seems to have been
regarded by the court as a plea of abatement, and by the
plaintiff's counsel as objectionable, not only on that ground,
but on the further ground that the general issue filed in the
case admitted that the defendant was a corporation, and the
two pleas, being inconsistent, could not stand together. I
think that both court and counsel were mistaken in the esti-
mate placed on this plea. It seems to be almost uniformly
held that when an action is brought by a corporation plain-
tiff and the defendant files the general issue, the capacity of
the plaintiff to sue is admitted. *Phœnix Bank* v. *Curtis* 14
Conn. 438, and authorities cited. In Massachusetts and New
York, decisions are to be found wherein it is held that
where a corporation is defendant and files the general issue,
it devolves upon the plaintiff to prove the corporate capacity

of the defendant.  *Stoddard* v.  *The Onondaga Annual
Conference*, 12 Barb. 573 ;  *Gott* v. *Adams Express Company*,
100 Mass. 320.  It must be observed that in Massachusetts
the plea of not guilty is made, by rule of court, tantamount
to the distinct denial of each and every allegation contained
in the plaintiff's declaration.  While at common law in cases
involving injuries to the absolute rights of persons, this
only puts in issue the act complained of, but in injuries to
the relative rights and to personal and real property, it puts
in issue the existence of the right as well as the commission
of the act complained of.  1 Chitty's Plead. 473.  If the
plea of the general issue admits the legal existence and
competency of a corporation to maintain an action, I cannot
perceive why the same rule should not apply to corporations
when sued as defendants.  The only effect of the admission
is that at the time of the institution of the suit, the corpora-
tion a party thereto was capable of suing or being sued.
That the rule is applicable in both cases is held by at least
two respectable courts.  *Gay* v. *Kay*, 30 Ill. 422 ; *Freeman*
v. *Milltes*, 38 Me. 345 ;  *Oldtown* v. *Veasie*, 39 id. 571 ; also,
587. Was the special plea filed by the defendant, denying
the corporate existence, in abatement or bar of the action ?
Speaking on this subject, SHARSWOOD, J., says :

A plea in bar impugns the right of action altogether; a
plea in abatement only the form or names in which it is
brought.  Stephen on Plead. 432.  Hence the misnomer of
a corporation as well as of a natural person must be pleaded
in abatement.  But the defense that there never was such a
natural person as the plaintiff *in rerum natura*, or that such
a corporation as that named as plaintiff or defendant never
existed, which are pleas of precisely the same nature, go to
the right of action altogether, and are, therefore, pleadable
in bar, one reason is that, in the latter case, the defendant
cannot give the plaintiff a better writ, which must generally
be done in abatement.  In a case reported in the Year
Book 22 Edw. IV, it is held that in an action by a corpora-
tion or natural person, misnomer of the one or the other
goes only to the writ, but to say there is no such person *in*

*rerum natura*, or no such body politic, this is in bar, for if he is misnamed, he can have a new writ by the right name, but if there be no such body politic or no such person, then he cannot have such action. This decision has been recognized and followed in subsequent cases both in England and in this country. *Mayor and Burgesses of Stafford* v. *Bolton*, 1 Bos. & Pul. 40; *Malden* v. *Miller*, 1 B. & Ald. 704; *Bank of Metropolis* v. *Orme*, 3 Gill. 444; *Town of Lewistown* v. *Proctor*, 27 Ill. 414; *Hoerett* v. *Franklin Mill Co.*, 30 id. 157; *School District* v. *Blaisdell*, 6 N. H. 198; *Proprietors of Sanopee* v. *Eastman*, 32 id. 473; *Northumberland County Bank* v. *Eyer*, 60 Penn. St. 439; *Gaines* v. *Bank*, etc., 12 Ark. 769. The plea must show, when in bar, that it goes to the cause of action alleged in the declaration, and not to the form or name in the writ. It has been settled, therefore, from the earliest period, that it is not enough in such a plea in a suit by a natural person to aver that there was no such person *in rerum natura* at the time of the issuing of the writ, but it must allege that there never was such a person. The same rule applies to the plea of *nul tiel* corporation.

In Massachusetts the plea of *nul tiel* corporation is regarded as good whether plead in abatement or bar of the action. *Christian Society*, etc., v. *McCumber*, 3 Met. 235; *Townsend* v. *First Freewill Baptist Church*, 6 Cush. 281; *Greenwood* v. *Lake Shore Railroad Co.*, 10 Gray, 374, and to the same effect is the case, *The Society*, etc., v. *Paulet*, 4 Pet. 480. It has been suggested that it is an anomaly in the law for a corporation to interpose this plea. The right to do so is abundantly established by many respectable courts. See authorities last above cited; also, *Judah* v. *Ins. Co.*, 4 Ind. 336; *Stone* v. *Cong. Society Berkshire*, 14 Ver. 86. In the plea under consideration it is averred "that it, the said defendant, was not at the commencement of said suit, and is not now, and was not, at the time the said supposed grievances in the declaration mentioned were committed, a corporation as by the said writ and declaration is

above supposed, etc. Taking this plea as true, it goes to the whole cause of action.

It is a special traverse of a material allegation of the declaration, to wit: that the defendant is a corporation. If there is no corporation, then the action must be defeated. It is claimed, however, that the plea of the general issue and the plea of *nul tiel* corporation are inconsistent and repugnant. That one wars upon the other. That the one denies what the other admits. Our statute provides that the defendant may plead as many matters of fact in several pleas as he may deem necessary for his defense. I take it to be well settled that when several pleas in bar are pleaded in virtue of this statute to one and the same thing or demand, each of them is treated, and operates as if it were pleaded alone. It being an established rule that one of them cannot in the language of Chief Justice WILLES, " be taken in to help or destroy another, but that every plea must stand or fall by itself." Commenting on a similar statute in England, Mr. Gould, page 433, section 26, says : " Many questions have heretofore arisen, as to *what* several defenses in bar may be pleaded together under this statute to one and the same demand," and a copious catalogue of such pleas as may, and of such as may not, be thus pleaded together is presented in Comyn's Digest, Pleader, E. 2. For an opinion was formerly entertained that mere inconsistency between two given pleas was a decisive objection to their being pleaded together, under the statute. But if such a rule should prevail, the statute would, in a great measure, be practically repealed. For the general issue which is almost universally the first of the several pleas pleaded together under the statute, is, on strict common-law principles, inconsistent with almost every special matter of defense whatever. At this day, however, it appears to be generally understood, as a sound rule in the construction of the statute, that mere *inconsistency* between two or more pleas in bar is no objection to their being pleaded together. A rule which would appear to follow of course from one before laid down, viz.: " That each of several pleas thus pleaded together is to be

considered as independent of all the others, and to operate as if pleaded alone.'' Of course this doctrine only applies to those pleas which require the same mode of trial. Pleas of abatement and bar cannot be pleaded together even under this statute. It seems to me therefore that the plea of *nul tiel* corporation filed by the defendant was a plea in bar, that it had a right to file the same, and that the sustaining of the demurrer thereto was error. On this subject, however, the majority of the court are at variance with me. A number of exceptions have been taken to the instructions, and it becomes important to examine them.

The first instruction given by the court is as follows : " In order to entitle the plaintiff to a verdict, it is incumbent on him to establish: 1st. That the injuries complained of by him resulted directly from the negligence of the servants or agents of the defendant while engaged in doing what was within the scope of their authority and agency to do. That the culpable negligence of the plaintiff did not contribute to occasion such injury, that is to say, that the plaintiff did not, on the occasion complained of, omit to exercise such effort and caution to avoid the accident and injury as a man of ordinary prudence and circumspection placed in the same circumstances would have exercised." It is claimed by the appellant that the instructions given do not embrace the law; that if the plaintiff was guilty of any negligence, that fact alone would preclude a recovery.

I am unable to accede to this proposition. It is conceded by text-writers, that all the American decisions upon this question have been professedly based upon the English precedents, and that if we can ascertain what was the real meaning of the English decisions thus cited, they should have controlling influence. Their conclusions are generally so reasonable and so clearly expressed, that but little hesitation can be felt in relying upon them as furnishing the true rule. In *Butterfield* v. *Forrester*, 11 East, 60, Lord ELLENBOROUGH says : " A party is not to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it, if he does not himself use

WESTERN UNION TEL. CO. v. EYSER.                159

common and ordinary caution to be in the right — one per
son being in fault will not dispense with another's using
ordinary care for himself. Two things must concur to sup-
port the action ; an obstruction in the road by the fault of
the defendant, and no want of ordinary care to avoid it on
the part of the plaintiff. In the case of *Bridge* v. *The
Grand Junction Railway Co.*, 3 M. & W. 244, PARKE, B.,
says : "The rule of law is laid down with perfect correct-
ness in the case of *Butterfield* v. *Forrester*, and that rule is,
that, although there may have been negligence on the part
of the plaintiff, yet, unless he might, by the exercise of
ordinary care, have avoided the consequences of the defend-
ant's negligence, he is entitled to recover. If by ordinary
care he might have avoided them, he is the author of his
own wrong. That is the only way in which the rule as to
the exercise of ordinary care is applicable to questions of
this kind."

In the case of *Davies* v. *Mann*, 10 M. & W. 545, the same
subject is considered, and it is there held that the plaintiff
is entitled to recover, notwithstanding he may be guilty of
some negligence, if the defendant might, by proper care,
have avoided inflicting the injury." To the same effect is
the case of the *B. & O. R. R. Co.* v. *Fitzpatrick*, 35 Md. 32;
Am. Law Reg. (N. S.), vol. 11, 596. I think the true rule
is, and should be, that if the plaintiff exercise reasonable
care, though he may have been guilty of some negligence
or want of caution, he is still entitled to recover for any in-
jury sustained in consequence of the defendant's negligence.
To defeat his action he should not only contribute to his
injury, but he must be in fault in so doing. If his share in
the transaction be innocent, and not faulty, it should fur-
nish no excuse for a defendant. Shearman & Redfield on
Negligence, § 28, and note 3, p. 16. And this doctrine seems
to have received the warm approval of the court of appeals,
in New York. In *Fero* v. *Railroad Company*, 22 N. Y.
215, BACON, J., says : "It is very possible that by unusual
precaution and watchfulness on the part of the plaintiff,
the consequences of the defendant's wrong might have been

less disastrous; yet, if he was guilty of no culpable negligence, the mere fact that he might have been more vigilant will not excuse the wrongful act of the defendant, nor deprive the plaintiff of all redress for the injury he has suffered." So in *Cook* v. *Transportation Co.*, 1 Denio, 91, BEARDSLEY, J., says: "There must be some wrongful act or culpable negligence on the part of the plaintiff to bai him on this principle."

It seems to me, therefore, that the instructions given lay down the law correctly, and are in no way open to the objection urged by appellant.

The court further instructed the jury: "That in fixing the plaintiff's damages they should compensate the plaintiff not alone for his actual loss of time during his confinement or disability, if any, resulting from the alleged accident, but might award exemplary damages proportioned to the nature and extent or character of the injury." Saving the question of exemplary damages for subsequent comment, I am of the opinion that the court below was quite favorable to the defendant in laying down the rule of damages in this case. When an injury is received of such extent and character as must disable one from labor, and require nursing and medical treatment, the loss from inability to labor and the expense of medical treatment are the necessary and uniform consequences of such an injury. They are not special damages in the sense of the term as it is used in the law of pleading and evidence; they are not caused by an incidental fact, or by the peculiar situation of the party, but are the natural and uniform effects of such injury. In addition to the mere expense of nursing and medical treatment, it has been held that a party suffering from injury occasioned by the neglect of another is entitled to recover for his bodily pain and mental suffering. And evidence is admissible to show the loss he has sustained by reason of his failure to prosecute his business. *Swarthout* v. *New Jersey Steamboat Co.*, 46 Barb. 222; *Nebraska City* v. *Campbell*, 2 Black, 591; *Wade* v. *Leroy*, 20. How. 34, 43, 44. And speaking on this subject, Judge

REDFIELD says : "There can be no doubt of the construction of this rule, the courts all agree in this." Am. Law Reg., vol. 10, p. 36.   It is claimed by the appellant that the court erred in instructing the jury that the plaintiff was entitled to recover exemplary damages.   1st. Because the negligence which is the  foundation of the suit was the negligence of the defendant's servants ; and, 2d, because the facts of the case disclose no fraud, malice, violence or cruelty.   Indeed, it is strenuously insisted on, that in the absence of *gross fraud*, *malice* or *oppression*, no exemplary damages can be awarded in any case.   It is further intimated that in no event can such damages be allowed against a corporation.

Notwithstanding the divinity which was anciently supposed to hedge in a corporation and shield it from liability on account of the wrongs done by its agents, these institutions, like all others, have fallen under the dominion of the law, and courts have not only applied to them principles congenial to the  present condition of society, but such as have been for a long  time applied to the conduct of individuals.   We recognize the fact that corporations enter into almost all the concerns of life, political, financial, eleemosynary.   They build churches, erect colleges, construct railroads, operate mines, run newspapers, distribute charities, and in some instances claim to be the sole custodians of the keys that unlock the gates of glory.   In every instance they act through agents, and so acting they may be made responsible in an action on the case for a tort ; and even in an action of trespass, if by their managers and authorized agents, they command the trespass to be committed, or sanction or approve the act when done.   1 Chitty, 87 ; *Underwood* v. *Newport Lyceum*, 5 B. Monroe, 130.   Artificial, as they may be, there is still a human intelligence and volition controlling their affairs just like those of an individual, and which may act wrongfully, maliciously and recklessly, thus laying the basis for exemplary damages.   Whatever may have been the doctrine anciently, it is now too well settled to be uprooted, that corporations like these defend-

ants, which are established and conducted in whole or in part for the pecuniary benefit of the members, are liable in actions for torts in the same way, and to the same extent as individuals and natural persons. *Railroad* v. *Rogers*, 28 Ind. 1; *Chestnut Hill, etc.*, v. *Rutler*, 4 S. & R. 6; *Hawkins* v. *Steamboat*, 2 Wend. 452; *Goodspeed* v. *Bank*, 22 Conn.; *Hopkins* v. *Railroad*, 36 N. H. 9. And it is equally well settled that where their conduct is characterized by gross negligence, although there may be an absence of malice and oppression, still they are amenable to exemplary damages. *Hopkins* v. *Railroad*, 36 N. H. 9; *Belknap* v. *Railroad*, 49 id. 358; *Henon* v. *McLaughan*, 32 Miss. 1; Sedgw. on Damages, 3d ed., 36. Text-writers have defined gross negligence to be the want of even slight care and diligence. In estimating the degree of care which it is incumbent on a person to use, regard must be had to the work to be done, and the place where it is to be done. If a switch were left open so that a passenger train jumped the track, this would certainly be a case of gross negligence, because it would indicate a heedless disregard for human life, and for the safety of passengers who intrust themselves to the care of the road. So the leaving open an area in a thoroughfare of a city, without putting up any thing to warn travelers of danger, has a strong character of cruelty and moral turpitude. So when a telegraph wire is found swinging across a public way at such height as to obstruct and endanger ordinary travel, it is in itself, unexplained and unaccounted for, evidence of negligence. *Thomas* v. *Western Union Telegraph Co.*, 100 Mass. 156. So, too, it has been held that where carriers undertake to convey persons by the powerful, but dangerous agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence, and any negligence in such cases says GRIER, J., deserves the epithet of gross negligence. *Railroad* v. *Derby*, 14 How. 486. So in *Shields* v. *Blackburn*, 1 H. Bl. 161, it is said by HEATH, J.: "If a man applies to a surgeon to attend him in disorder for a reward, and the surgeon treats him improperly, there is

gross negligence;" and Lord LOUGHBOROUGH declares that omission to use skill is gross negligence. That which is harmless under one state of circumstances becomes highly reprehensible under another. It is claimed, however, that there is nothing in the evidence from which gross misconduct, amounting to recklessness, could be inferred, or that the persons who stretched the wire across Blake street were actuated by willful or intentional motives to injure the plaintiff, or any one else.; that they were engaged in a great public work which commends itself to the protection of the law ; that persons engaged in the erection of telegraph wires across the streets of a city are absolutely compelled by law to place such wires in position in the short space of one-half minute, or be liable for gross negligence, is a rule that must be regarded as unreasonable and harsh, for it is absolutely requiring of all who may engage in an enterprise of this kind an impossibility, and instead of making the law a protection to such persons, it would become an engine of oppression. It is but just to the court below to say that the counsel misapprehends and misconstrues the instruction. It does not require the erection of the wire in one-half minute, or in any length of time. What it does require is, that at no time during its erection shall it be left unguarded so that it may become an object of stumbling, and a snare to those who travel the public streets. And thus understood, it is far from being unreasonble and harsh. It may be conceded that a company has a right to construct a telegraph line through the streets of a city, but the exercise of this right or privilege is accompanied by a public duty, that cannot be ignored nor disregarded, and that duty is to see that the public suffer no detriment, and that individuals are exposed to no danger through the laches or negligence of the party doing the work. Every precaution must be taken to prevent mishap. Guards, flags, or other means equally efficacious, should be used to warn the people that the street is obstructed. In this case it does not appear that any precaution whatever was taken ; the public were left to learn that there was obstruction by becoming

entangled in it.   I can hardly conceive of a case that savors
more strongly of gross and culpable negligence.   *Clark*
v. *Fry*, 8 Ohio St. 359 ; *Chicago* v. *Robbins*, 2 Black,
418.   Nor is it necessary that an intention to inflict injury
should exist.   The law requires the plaintiff to show noth-
ing of the kind.   If the negligence of the defendant is such
as to cause injury, and does cause injury, it is immaterial
what his intentions are or may be, the result is the same, as
is also his liability.   *Amish* v. *O'Hana*, 6 Blackf. 258 ;
*Tally* v. *Ayres*, 3 Sneed, 677.   That is negligence which the
law does not excuse, and it certainly does not excuse an
injury inflicted on an individual through carelessness.   It
is objected to this instruction, that it takes away from the
jury the determination of the degree of negligence.   The
language of the court is substantially, "That if the negli-
gence of the defendant occasioned the injury, then the jury
should award exemplary damages."   It seems clear that
every degree of negligence does not warrant the infliction of
such damages.   There is a class of acts extremely injurious
to individuals, of which the criminal law takes no cognizance,
and yet that which the public interests require shall be
punished.   I refer to those acts whose commission is
attended with fraud, malice, oppression or gross negligence.
When either of these elements mingle in the controversy,
the law, instead of adhering to the system of compensation,
adopts a wholly different rule.   It permits the jury to give
what it terms punitive, vindictive, or exemplary damages ;
in other words, it blends together the interest of society and
the aggrieved individual, and gives damages not only to
recompense the sufferer, but to punish the offender.

When the wrong done to the party partakes of a criminal
character, though not punishable as an offense against the
state, the public may be said to have an interest that the
wrong-doer should be prosecuted and brought to justice in
a civil suit ; and exemplary damages may, in such cases,
encourage prosecution where a mere compensation for the
private injury would not repay the trouble and expense of
the proceedings.   But it is only where these elements, or

one of them, enter into the act that this·species of damages is allowed.  Fraud and malice and negligence are by no means identical in their nature and effect.  Fraud is a deceitful practice or willful design, resorted to with intent to deprive another of his right, or in some measure to do him an injury.  It is always positive — the mind concurs with the act.  What is done, is done designedly and knowingly ; but in negligence, whatever may be its grade, there is no purpose to do a wrongful act.or to avoid the performance of a duty.  There is, however, an absence of proper attention, care or skill; it is strictly non-feasance, not malfeasance ; this is the general idea, and it makes the distinction between negligence and fraud.  In the first, there is no positive intention to do a wrongful act ; but in the latter, evil is designed or intended, and this seems to be equally true of malice.  *Gardner* v. *Heartt*, 3 Denio, 232, 237.  BEARDSLEY, C. J., in *Railroad* v. *Munger*, 5 Denio, 267, says : "Negligence, even where gross, is but an omission of duty.  It is not designed and intentional mischief, although it may be cogent evidence of such an act."  It must not be overlooked, however, that there is a strong tendency in the courts to ignore these degrees of negligence which owe their birth to the civil law, and which were engrafted on the common law.  Speaking on this subject, CURTIS, J., in *Steamboat New World* v. *King*, 16 How. 475, says : "It may be doubted if these terms can be usefully applied in practice.  Their meaning is not fixed, or capable of being so ; one degree, thus described, may not only be confounded with another, but it is quite impracticable to distinguish them.  Their significance necessarily varies according to circum· stances to whose influence the courts have been forced to yield, until there are so many real exceptions, that the rules themselves can scarcely be said to have a general operation."  He further adds. "Recently the judges of several courts have expressed their disapprobation of these attempts to fix degrees of diligence by legal definitions, and have complained of the impracticability of applying them."  *Wilson* v. *Bret*, 11 M. & W. 113 ; *Wyld* v. *Peckford*, 8 id. 443,

461, 462; *Henton* v. *Dibbin*, 2 Q. B. 646, 651. It may be added that some of the ablest commentators on the Roman law and on the civil code of France have wholly repudiated this thing of three degrees of negligence, as unfounded in principles of natural justice, useless in practice, and presenting inextricable embarrassments and difficulties. In the case in 13 Wallace, it would seem to be clearly deducible from the language of Mr. Justice FIELD, that all degrees of negligence are ignored by that court. In the case of the *Railroad* v. *Heaton*, 37 Ind. 455, the court treat these degrees of negligence with manifest disfavor. So, also, in *Davis* v. *Graham*, 4 Ohio St. 362. In *Steinway* v. *Railway*, 43 N. Y. 123, the court say, "That the defendant, a corporation, was liable if there was negligence on its part, without regard to any supposed distinctions or degrees of negligence." It is strenuously insisted on by the appellant, that the court should have submitted to the jury the question of gross negligence; that it is a question of fact for the jury, and not one of law for the court. We cannot accept this as being the true doctrine in the broad language in which it is stated. Sometimes negligence is regarded as a simple question of fact, sometimes as a mixed question of law and fact, and not infrequently as a pure question of law. Speaking on this subject, Judge REDFIELD says: "The question, whether a party has been negligent in a particular case, is one of mingled law and fact. It includes, indeed, two questions, whether a particular act has been performed or omitted, and (2) whether the performance or omission of this act was a breach of a legal duty. The first of these is a pure question of fact, the second, a pure question of law. The extent of the defendant's duty is to be determined by a consideration of his circumstances, and though the law defines the duty, the question, whether the circumstances exist which impose that duty upon a particular person, is one of fact. When the facts are clearly settled, the court should decide the case as a matter of law." Shearman & Redfield's Neg. 12. The facts which show the existence of gross negligence are un-

controverted.   We have the case of a company erecting a telegraph wire in the streets of a city, where people are constantly passing and repassing.   We have the fact that this wire was suspended across the street, at a distance from the ground calculated to obstruct and entangle people as they passed.   We have the further fact that no guards were stationed, nor flags put up to warn people of the pending obstruction.   The omission to use these precautions was a plain breach of a public duty.   Although these facts were uncontroverted, the court still submitted them to the jury, and they were told that if they found them to exist, they would be justified in awarding punitive damages.   In this there was no error.

It is claimed, however, that the evidence fails to show that the wire was being erected under the direction of the defendant.   We are of a different opinion.   The facts disclosed are as follows :   B. F. Woodward was in the employ of the defendant as operator and manager at this place ; subordinate, however, to Hibbard, who was the defendant's superintendent for the third division, Clowry was also in the employ of the defendant, as superintendent of the second division.   Woodward, under directions from Hibbard, employed Washburn to put up the line.   The expenses were reported to Clowry, and the money to adjust them forwarded by him.   Here, then, we have three superintendents of the defendant all engaged in the work of erecting a line, and their conduct supplemented by the further fact that the line is used by the company, and the money, arising therefrom, placed in the general treasury.   If corporations are invisible and intangible, this one comes quite prominently into view through gentlemen who fill its offices, and manage its affairs.

It is claimed, however, that all this does not show that these superintendents had authority from the company to do this work.   By the general rules of evidence, presumptions are continually made, in cases of private persons, of acts even of the most solemn nature, when these acts are the natural result or necessary accompaniment of other circum-

stances. For instance, it presumes that every man in his private and official character does his duty until the contrary appears. It will presume that a man acting in a public office has been rightly appointed. The same presumptions are applicable to corporations. Persons acting publicly as officers of the corporation are presumed to be rightfully in office. Acts done by the corporation, which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter. If officers of the corporation openly exercise a power which pre-supposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed. Each affords presumptions from acts done of what must have preceded them, as matters of right or matters of duty. *Bank* v. *Dandridge*, 12 Wheat. 69, 70; *Spilman* v. *Foster Iron Co.*, 56 Barb. 151; *Railway* v. *James*, 24 Wis. 392. In the absence of any direct proof, as to the authority of these superintendents, the jury were warranted in presuming that they had it. It is further objected, that the court erred in permitting the appellee to question Woodward about a supposed contract. This contract was not offered in evidence. The interrogatories simply went to its existence. What it did or did not contain, or whether it existed at all, does not appear. We do not think that this attempt to prove a contract had any influence with the jury. If any injury was apprehended from this, the appellant should have asked the court for an instruction, and failing to do so, the question cannot be raised here. *Penock* v. *Dunlogan*, 2 Pet. 15. Complaint is made because the court allowed the plaintiff to introduce the ordinances of the city of Denver. These were clearly admissible, not only to show that Blake street was a highway, but also on the question of negligence. *Railroad* v. *Taffe*, 37 Ind. 376; *Railroad* v. *Fitzpatrick*, 35 id.; *Chicago* v. *Rollins*, *supra*. Other points are made which we have carefully examined. We are all of the opinion that no

error was committed on the trial of this case, and the judgment is therefore affirmed.

WELLS, J.   No opinion is expressed upon the question whether the plea of *nul tiel* corporation may be pleaded in bar, or not, but the majority of the court are of the opinion that the defendant cannot deny its own capacity by a plea pleaded either alone or with other pleas in abatement or in bar.   If the defendant be not a corporation, then it is nothing ; it cannot appoint an attorney, it cannot, by attorney or otherwise, be present in court ; it cannot plead, for it is not ; the plea is, therefore, *felo de se.   The President & Trustees, etc.* v. *Wadleigh,* 6 Blackf. 297.

The demurrer to this plea was, therefore, properly sustained.

Upon the other questions the opinion of Mr. Justice BELFORD is the opinion of the whole court.

Let the judgment of the district court be

*Affirmed.*