GREAT WESTERN MIN. & MFG. CO. v. HARRIS' ESTATE et al.

(Circuit Court, D. Vermont. October 17, 1901.)

1. CORPORATIONS—LIABILITY OF OFFICERS—EFFECT OF STATE STATUTES.

State statutes imposing liabilities upon officers and directors of corporations do not exclude their common-law liability for misfeasance and negligence in the performance of their duties as such officers or directors.

2. LIMITATION—LAW GOVERNING—ACTIONS AGAINST OFFICERS OF CORPORATION

An action to charge the defendant, as an officer and director of a corporation, for acts of misfeasance in the management of the affairs of the corporation, being for the enforcement of a common-law liability, is governed as to limitation by the law of the forum, and not by that of the domicile of the corporation.

3. CORPORATIONS—INCREASE OF STOCK.

The issuance by a corporation of additional stock, within its powers, and its distribution pro rata among its then stockholders, although without receiving payment therefor, is an act which is not in itself injurious to the corporation or its creditors, and of which the latter cannot complain.

4. SAME—RIGHTS OF CREDITORS—WRONGFUL DIVERSION OF ASSETS.

A corporation issued 500 shares of additional stock, which it distributed pro rata among its stockholders as a stock dividend. It afterwards desired to sell an issue of bonds, and offered the same at 60 per cent. of their par value, but was unable to sell them. It received an offer, however, of 85 per cent. for the bonds, provided it would also issue to the purchasers one-half the same amount of its capital stock, which would amount to 1,500 shares. It accepted such offer, making an agreement with its stockholders that they should furnish the stock pro rata, and receive 25 cents out of every 85 received for the bonds and stock,

and at the same time it issued to such stockholders 1,000 shares additional stock, reciting as the consideration therefor the making of permanent betterments on its property from its net profits. This arrangement was not stated to the purchasers, and the indebtedness created by the bonds was as large as the company's assets, including the proceeds of the bonds and stock, could pay. *Held*, that the portion of such proceeds received by the stockholders on account of the 500 shares of stock previously issued and owned by them could not be considered as having been paid by the corporation, or as depleting its assets, but that the transaction as to the 1,000 shares issued at the time the loan was made was the same in effect as though they had been issued directly to the purchasers, and their proceeds became assets of the corporation, and were wrongfully diverted by their payment to the stockholders as against the bondholders, who were entitled to recover them back on a deficiency of assets to pay the bonds.

5. SAME—JOINT LIABILITY OF DIRECTORS—FUNDS WRONGFULLY DIVERTED.

Directors of a corporation, while they may be held jointly liable for misfeasance or neglect of duty in permitting the wrongful diversion of funds of the corporation to themselves and the other stockholders, are not jointly liable for the sums so received by each of them separately as stockholders.

6. ABATEMENT AND REVIVAL—SUIT AGAINST DIRECTOR OF CORPORATION.

On general principles an action to charge the defendant with liability for misfeasance as a director of a corporation in permitting the wrongful diversion of its funds does not survive, and a suit in equity to enforce such liability, and also to recover from defendant sums so diverted and received by himself, on his death, and in the absence of a state statute permitting it, can only be revived and prosecuted against his executors for the latter purpose, to recover such sums as went to benefit his estate.

In Equity. Suit by the receiver of a corporation to charge defendant with liability as a director and stockholder. Defendant having died pending the suit, it was revived against his executors.

See 96 Fed. 503.

Cleveland & Bowler and Dillingham, Huse & Howland, for plaintiff.

Waterman & Martin and John Seymour Wood, for defendants.

WHEELER, District Judge. The Great Western Mining & Manufacturing Company was a corporation of Kentucky, with a capital stock of $200,000, in shares of $100 each, of which the defendant's testator, a citizen of Vermont, held 600, and a brother of the testator 600,—bought in 1883, at $30 per share,—another person 440, another 300, another 52, and two others 4 each. The five largest stockholders were the directors, and the testator was the president. It had lands, mines, and transportation facilities in Kentucky, and largely produced and sold coal. It issued $50,000 of new stock ratably to the stockholders in January, 1888, and it owed $131,585.03 December 31, 1888. Negotiations for placing $300,000 of mortgage bonds had been going on, and offers had been made for the sale of them at 60 per cent., without finding purchasers. A proposition was made by brokers to the directors April 18, 1889, for putting them on sale at 85 per cent., with a bonus of half as much stock as of bonds. At the annual meeting April 22d—

"The attention of the stockholders being called to the large amount of net earnings being used for construction and betterments, the following res-

olution was presented, and, after consideration, was adopted, to wit: Whereas, there have been expended for permanent improvements and betterments, including machinery, barges, flats, etc., during the years 1884, 1885, 1886, 1887, and 1888, more than $160,000.00, all of which sum has been furnished from the net earnings of the company and fairly belongs to the stockholders of the company: Therefore, resolved, that the directors of this company be, and hereby are, authorized and requested to direct the president and secretary of the company to issue one thousand shares of the capital stock of the company, to be divided pro rata among the present stockholders of this company, as follows: To B. D. Harris, 300 shares; G. D. Harris, 300 shares; John Carlisle, 220 shares; G. W. Carlisle, 150 shares; George S. Richardson, 26 shares; James C. Holden, 2 shares; L. Hinsdale, 2 shares. The matter of negotiating a loan for the benefit of the company was also taken up, and a resolution authorizing the loan to the amount of $300,000.00, for which bonds were to be issued, was approved."

On the same day the directors voted:

"That the president and secretary of the company shall arrange for the sale of the $300,000.00 bonds aforesaid, in their discretion, at the best price obtainable, and the proceeds thereof shall be applied to the cancellation and retirement of $60,000.00 first mortgage 7% bonds dated January 1, 1884, now outstanding, also to the payment of all floating indebtedness incurred up to the date hereof for material and construction, and the balance shall be used by the directors for the best interests of the company."

They also passed the following resolutions:

"Whereas, at the annual meeting of the stockholders of this company a resolution was adopted requesting the directors to issue additional capital stock of this company to the amount of $100,000.00, to be divided pro rata among the present stockholders, and based upon the fact that during the last five years more than $160,000.00 of the net earnings of the company have been expended for permanent improvements and betterments, thereby adding that amount to the assets of the company which belong to the stockholders of the company: Therefore, resolved, that the president and secretary of this company are hereby directed to issue one thousand shares of the capital stock of the company to the present stockholders in proportion to the amount of stock already owned by them, respectively."

A transaction took place among the stockholders as such and the directors as such, as shown by the following extracts from the records of the company:

"Proposition of Stockholders of the Great Western Mining and Manufacturing Company to the Directors of said Company.

"Whereas, the directors of the Great Western Mining and Manufacturing Company have taken steps to borrow the sum of $300,000.00, to be used in payment of existing indebtedness of the company and to provide additional working capital, etc., and have authorized the president and secretary to execute bonds for said amount, and to negotiate the same at the best price obtainable; and whereas, we are informed that it will probably be possible to find purchasers for said bonds at the price of eighty-five per cent. of the par value thereof, provided that stock of the company to the extent of fifty per cent. of the par value of the said bonds shall also be transferred to the several purchasers of said bonds; and whereas, it is deemed to be inexpedient to issue any new stock of the company for such purpose, and desiring to do all we can to assist the directors in procuring said loan and the sale of said bonds: We therefore make this proposition to the directors of the company in reference to the sale of stock held by us in said company to the purchasers of the said bonds, to wit: We will sell to the several purchasers of said bonds of the company stock of the company belonging to us in the amounts set opposite to our names, respectively, and will furnish to the secretary of the company certificates of said stock, assigned in blank, to be by him delivered to said purchasers of said bonds, upon the understanding

and agreement that we are to receive the sum of $50.00 for each share of stock so sold by us out of the money paid for said bonds, and said secretary shall act as our agent in receiving said amounts, and shall pay us the same before the company shall be entitled to have the remainder of the money paid for said bonds by the purchasers thereof. This action is not to be construed as a proposition to sell said stock to the company, but it is to be treated and regarded as a sale of stock directly to the purchasers of said bonds, to be paid for by them to us, and the payment by them to the secretary of this company for said bonds shall be regarded as a payment to us for said stock to the extent necessary to pay us therefor upon the terms above stated. In testimony whereof we have hereunto set our hands on this third day of May, 1889.

| | |
|---|---|
| B. D. Harris, | 450 shares. |
| "G. D. Harris, | 450 shares. |
| "John Carlisle, | 336 shares. |
| "Geo. S. Richardson, | 39 shares. |
| "G. W. Carlisle, | 225 shares. |
| | |
| "Total, | 1,500 shares. |

"After full consideration of the proposition, the same was accepted, and the secretary was authorized to act as the agent for said stockholders in the proposed sale of their stock and the collection of the purchase money therefor, and directed to turn over the net proceeds of the sale of bonds into the treasury of the company."

A mortgage was made, and $300,000 of bonds bearing 6 per cent. semiannual interest were issued, dated June 1, 1889, and sold in several various amounts, with half as much stock transferred in blank, and deposited ratably by the stockholders with the treasurer, who delivered it with the bonds to the takers of them respectively. The stock of the testator was transferred at various times between September 7, 1887, and March 7, 1890. Of the money received by the treasurer for the bonds and stock, 25 per cent., being 50 per cent. of the stock, was paid by the treasurer to the several stockholders furnishing the stock. The testator furnished 450 shares of the stock, and received $22,500 of the proceeds of the bonds and stock in that manner; all the stockholders received $75,000, and the corporation retained $180,000. The avails of the loan, $255,000, were entered as such on the books of the corporation, and the $75,000 paid to the stockholders was entered as an expense of the loan. The $22,500 was sent to and received by the testator, and this bond transaction was closed in 1890. The business of the corporation was continued, debts were created, dividends were declared and paid to those holding the stock that went with the bonds, but none to the testator upon his original stock after January 1, 1891, and interest coupons from the bonds were paid till 1892, when the receiver was appointed, on a creditors' bill, by the circuit court of the United States for the district of Kentucky. The mortgage was foreclosed by intervention in that suit, and the property covered by the mortgage was sold for $70,000, and the other property for $5,666.67. The avails of the mortgaged property, after deducting expenses, were applied on the mortgage debt, leaving the remainder thereof amounting to more than the face of the bonds still due. The other debts amounted to $122,221.32. This suit was brought by direction of that court in July, 1895, to charge the testator with the $75,000 paid to him and the other stockholders, and for other losses of the corporation alleged to have been caused by mismanagement and negligence

of the directors; but all claims except as to the issues of $50,000 of stock in 1888, and of $100,000 of stock in 1889, and the $75,000 received by the stockholders from the bond and stock transaction have, on the argument, been waived.

The defenses set up to this claim for money withdrawn from the corporation and relied upon are principally that the corporation was solvent at the time of the respective increases and distributions of the stock, and that they were, therefore, lawful and proper; that the stock was sold by the stockholders directly to the bondholders, wherefore the money received for it was not withdrawn from the corporation; that all debts existing at the time of either of the increases of stock have been fully paid, and that the future creditors have no cause to complain; that the statutes of Kentucky on this subject have not been pleaded, proved, or followed; laches; and the statutes of limitations of Kentucky. This suit is not brought upon any statute of Kentucky, but, like Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, is founded upon the common-law liability for misfeasance and negligence in the performance by the testator of his duties as a director and president of the corporation about withdrawing and allowing the withdrawal of these moneys from the corporation, and statutes of that state providing other liabilities would not exclude these any more than the provision of other liabilities of directors by the national bank act excluded such common-law liability in that case. No statute of limitations is set up, and, if any was to be, that of Vermont, with the courts of which state this court has concurrent jurisdiction, would govern. Bauserman v. Blunt, 147 U. S. 647, 13 Sup. Ct. 466, 37 L. Ed. 316. The limitation of the state statutes applicable is six years. V. S. § 1199. This suit was brought within that time after the withdrawal and receipt of the money by the testator.

That the assets of an insolvent corporation are impressed with a trust for the payment of its debts, and cannot be withdrawn by the stockholders without providing for the debts, does not here appear to be, and could not well be, disputed. Graham v. Railroad Co., 102 U. S. 148, 26 L. Ed. 406; Railroad Co. v. Ham, 114 U. S. 587, 5 Sup. Ct. 1081, 29 L. Ed. 235; Richardson v. Green, 133 U. S. 30, 10 Sup. Ct. 280, 35 L. Ed. 516. The substance of the plaintiff's claim is for the withdrawal of the money received for the mortgage bonds, and not for the increases of stock, and the question of solvency would refer to the situation at the time of the withdrawal. The prior debts had then been, or soon were, paid, but the mortgage bonds were outstanding, and the avails of them were what paid the prior debts. They were debts of the corporation, and in view of the whole situation as shown by the evidence they amounted to as much at least as the corporation could at most pay, and the depletion of any part of the $75,000 that came from the corporation would be more than it could spare. The increases of stock were far within the limits of the power of the corporation, and these issues of it ratably to the stockholders would in themselves work no harm. The stockholders would, as between themselves, own the corporate property in the same proportions as before. Outsiders would not be affected till

reached. Then they would be entitled to stand upon their rights to protect themselves. The first increase of stock was made more than a year before there appears to have been any suggestion of using stock to effect a loan, and to have been entirely separate from the bond transaction. When made, and ratably divided, it would not of itself affect at all the stockholders as between themselves or outsiders. If sold to others, whether it was valuable or not, or at a fair or unfair price, the corporation would not be pecuniarily affected. If it brought 25 cents of the 85 cents on the dollar of the face of the bonds that the stock and bonds brought, that part would belong to the stockholder furnishing the stock, and not to the corporation; and the receiving of that by the stockholders would not be depleting the assets of the corporation. The bonds would not float at 60. The bonds and stock would at 85. The inference follows that the bonds brought 60 and the stock 25. The stockholders and directors agreed to this among themselves each with the others, and that would confirm the division, for, although directors may not contract away to any of themselves more than to others the property of the corporation to the detriment of creditors, they are not precluded from dealing fairly with any of their number in respect to what is his own. This deal may not have been fair to the takers of the bonds and stock for want of value to the stock, but the point here is whether there was a fair division between the corporation and the stockholders of the avails of the transaction as it was, fair or unfair, according to the proportion of the consideration furnished by each. The amount received for this issue of stock, in this view, was $25,000, of which the defendants' testator received $7,500 as the price of the stock furnished by him that did not come from the last issue, but had been divided to and become his before any negotiation of the bonds as well as any of his prior stock had. The last issue of stock was concurrent with the issue and negotiation of the bonds and stock, and that stock moved as much from the corporation to the new bondholders as if it had been issued directly to them, instead of through the prior stockholders to the bondholders. Neither the statement in the vote of this stock that it was based upon the expenditure of net earnings for permanent improvements, nor the provision in the proposal of the stockholders that the secretary should act as their agent in transferring the stock and receiving the money, nor the protest that the action should not be construed as a sale of the stock to the company, but should be regarded as a sale to the purchasers of the bonds, could alter the nature of the transaction, or its source or its place, as a part of the consideration for the money received from the bondholders. The whole moved from the corporation, and the transaction wrought a depletion of assets of the corporation needed to make the bonds good, and to which the bondholders were entitled, if necessary, for the payment or security of the bonds. There was no agreement between the stockholders and the bondholders as to the price of the stock, nor otherwise except among the stockholders themselves. As to the bondholders, according to the evidence, it was a mere bonus to float the bonds. The stockholders receiving the money took it with the risk of its being required to

make the bonds good. It is so required, and the plaintiff, as receiver, represents the rights of the bondholders as creditors in respect to it. Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662. The avails of this increase were $50,000, of which the testator received $15,000.

The plaintiff claims that the testator is liable not only for what he drew out of the assets and received himself, but for what the others drew out and received, amounting to the whole $75,000, and inclusively the whole $50,000 which all drew out and received in connection with the last increase of stock. They did not, however, become liable jointly because they constituted a board, and are sometimes called trustees. They are not invested with title as a joint board, but are rather managing agents, whose relations to the property are several and personal, and not those of a joint trust estate. Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662. If it had all been received by the directors together, and divided among themselves, all would probably have been liable together, and each for the whole, till all should be recovered; but each received his share separately, without connection with the others, from the avails of the sale of the bonds that his stock went with. Each may have been liable for the whole loss for neglect of personal duty in not preventing it, but not for the money itself. An action on the case might have lain against all, but, if one had been brought, it could not have been revived against the executors of the testator, and prosecuted, but would have survived only against the others, and the executors could not have been proceeded against but by a new suit on what would survive. Seaman v. Slater (C. C.) 18 Fed. 485. This suit has been and could be revived only as to and for what would survive, and can be prosecuted only for that. This is governed wholly by the laws of the state where the suit is brought and being proceeded with. Railroad Co. v. Joy, 173 U. S. 226, 19 Sup. Ct. 387, 46 L. Ed. 677. General principles derived from similar laws elsewhere are, of course, applicable. U. S. v. Daniel, 6 How. 11, 12 L. Ed. 323, was an action on the case against a marshal for neglect of a deputy. Mr. Justice McLean said:

"If the person charged has secured no benefit to himself at the expense of the sufferer, the cause of action is said not to survive; but where, by means of the offense, property is acquired which benefits the testator, there an action for the value of the property shall survive against the executor."

The statute of North Carolina upon which the question arose, and which provided that actions on the case should not abate by death, was held not to vary this principle. Upon the same principle an action for causing a pauper to become chargeable upon the town was held not to survive. Town of Winhall v. Sawyer's Estate, 45 Vt. 466. And in this court an action against a director of a national bank for personal neglect of duty has been held not to survive. Witters v. Foster (C. C.) 26 Fed. 737. In Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924; 35 L. Ed. 662, which was Movius v. Lee in the circuit court (30 Fed. 298), there was a decree against executors for defaults of directors of a national bank, but it was rendered without question upon the bill taken pro confesso, and not upon the

consideration or judgment of either court. That case is therefore not understood to be an authority for the survival of a suit against directors for mere neglect or misfeasance not affecting the estate of the testator.

The result of these views is that the plaintiff is entitled to a decree for the amount received by the testator through the last issue of stock.

Decree for plaintiff for $15,000.