## GREAT WESTERN MIN. & MFG. CO. v. HARRIS et al.

### (Circuit Court of Appeals, Second Circuit.    December 16, 1903.)

### No. 12.

**1. CORPORATIONS—RIGHTS OF CREDITORS—WRONGFUL DIVERSION OF ASSETS.**

A corporation, which had endeavored without success to sell an issue of bonds at 60 per cent. of their par value, received an offer of 85 per cent. for the bonds with a bonus of stock equal to 50 per cent. of the bond issue. It accepted such offer, making an agreement with its stockholders by which they furnished the stock pro rata, and received therefor 25 cents out of every 85 paid by the bond purchasers. At the same time the corporation issued to them additional stock equal to a part of the amount sold, reciting as consideration therefor the previous making of permanent betterments on its property from net profits. *Held*, that such stock transaction did not affect the corporation, or the value of its assets, so as to entitle it or its bondholders or creditors to recover from the old stockholders the amounts so received by them as assets wrongfully withdrawn from the corporation; its effect, so far as creditors were concerned, being the same as though it had sold its bonds at 60 per cent.

**2. RECEIVER—RIGHT TO SUE IN FOREIGN JURISDICTION.**

A receiver of the property and assets of an insolvent corporation, appointed by a court in the exercise of its general equity powers, cannot maintain a suit to collect moneys in another jurisdiction, either in his own name or that of the corporation, nor can he be authorized by the court to do so, unless in the exercise of a power given it by statute or otherwise it has vested title in the receiver, or where the corporation, acting within its corporate powers, has vested him with such title or authorized him to sue in its name.

**3. CORPORATIONS—CONTRACT WITH STOCKHOLDERS—SUIT TO ANNUL.**

Neither a corporation nor a receiver suing in its name and behalf can maintain a suit to set aside a contract made between the corporation and all its stockholders. Such a contract can only be attacked by or on behalf of creditors who are shown to have been defrauded thereby.

**4. SAME—DIVIDENDS RECEIVED BY STOCKHOLDER—LIABILITY FOR REPAYMENT.**

A stockholder is not liable to creditors of the corporation for dividends received by him in good faith while the corporation was a going concern and solvent.

Appeal from the Circuit Court of the United States for the District of Vermont.

For opinion below, see 111 Fed. 38.

This cause comes here by cross-appeals from a decree of the United States Court for the District of Vermont in favor of the complainant for $15,000, and dismissing all the other claims made in a bill brought in the name of the Great Western Mining & Manufacturing Company, a citizen of Kentucky, by L. C. Black, its receiver, by virtue of the authority vested in him under an order of the United States Circuit Court for the District of Kentucky, appointing him receiver of the property and assets of said company, and directing him to institute suits against the shareholders and directors of said company for the recovery of sums lost to said company by the withdrawal of certain moneys by its stockholders and officers by the issuance of stock to them with-

¶ 1. Stockholders' liability to creditors in equity, see note to Rickerson Roller Mill Co. v. Farrell Foundry & Machine Co., 23 C. C. A. 315; Scott v. Latimer, 33 C. C. A. 23.

¶ 2. Suits by and against receivers of federal courts, see note to J. I. Case Plow Works v. Finks, 26 C. C. A. 49.

¶ 4. See Corporations, vol. 12, Cent. Dig. § 869.

out consideration, and through negligence and mismanagement of its board of directors.

Harlan Cleveland, for complainant.
Brainerd Tolles, for defendants.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. The complainant, a Kentucky corporation, by this bill asks for an accounting and damages from the estate of defendants' testator, B. D. Harris, who was a resident of Vermont, and was an officer, director, and stockholder in said corporation from 1883 to 1892. Other parties were named defendants in the bill, but no process was issued against them, and no other defendant appeared.

As found by the court below:

"This suit is not brought upon any statute of Kentucky, but, like Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, is founded upon the common-law liability for misfeasance and negligence in the performance by the testator of his duties as a director and president of the corporation about withdrawing and allowing the withdrawal of these moneys from the corporation."

At the close of the hearing the complainant claimed that the estate of B. D. Harris was liable as follows:

"(1) For the sum of $75,000 as a joint and several liability of the directors and officers of the company, with interest thereon from January 11, 1890, the first date shown by the record that the $75,000 had been taken from the company.

"(2) For $45,000 as a several liability as stockholder, on account of the issue to himself, without consideration, on January 11, 1888, of one hundred and fifty shares, or $15,000, of stock, and on April 22, 1889, three hundred shares, or $30,000, of stock, to be accounted for, $15,000 as of January 11, 1888, and $30,000 as of April 22, 1889.

"(3) For the damages suffered by the company by reason of the issue to the other stockholders of the Great Western Mining & Manufacturing Company by B. D. Harris and the other officers and directors of the company on January 18, 1888, of three hundred and fifty shares, or $35,000, of stock, and on April 22, 1889, of seven hundred shares, or $70,000, of stock, without consideration, to determine which said damages and injury a reference should be had to a master.

"(4) For the dividends wrongfully paid out of capital stock between April, 1889, and July, 1892, as a joint and several liability of the directors and officers of the company so paying said dividends, and for the dividends paid B. D. Harris individually as a several liability of his estate."

As to these claims the court below finds as follows:

"All claims except as to the issues of $50,000 of stock in April, 1888, and of $100,000 of stock in 1889, and the $75,000 received by the stockholders from the bond and stock transaction, have, on the argument, been waived."

Thus it appears that, while the action is bottomed on a common-law right, and, as to the claims insisted on in the court below, is for money damages only, the bill is in form one for equitable relief. The opinion of the court below accurately and succinctly states the facts concerning these transactions, as follows:

"The Great Western Mining & Manufacturing Company was a corporation of Kentucky, with a capital stock of $200,000 in shares of $100 each, of which the defendant's testator, a citizen of Vermont, held 600, and a brother of the

testator 600, bought in 1883 at $30 per share, another person 440, another 300, another 52, and two others 4 each. The five largest stockholders were the directors, and the testator was the president. It had lands, mines, and transportation facilities in Kentucky, and largely produced and sold coal. It issued $50,000 of new stock ratably to the stockholders in January, 1888, and it owed $131,585.03 December 31, 1888. Negotiations for placing $300,000 of mortgage bonds had been going on, and offers had been made for the sale of them at 60 per cent., without finding purchasers. A proposition was made by brokers to the directors April 18, 1889, for putting them on sale at 85 per cent., with a bonus of half as much stock as of bonds. At the annual meeting April 22d—

" 'The attention of the stockholders being called to the large amount of net earnings being used for construction and betterments, the following resolution was presented, and, after consideration, was adopted, to wit:

" 'Whereas, there have been expended for permanent improvements and betterments, including machinery, barges, flats, etc., during the years 1884, 1885, 1886, 1887 and 1888, more than $160,000.00, all of which sum has been furnished from the net earnings of the company and fairly belongs to the stockholders of the company,

" 'Therefore resolved, that the directors of this company be, and hereby are, authorized and requested to direct the president and secretary of the company to issue one thousand shares of the capital stock of the company, to be divided pro rata among the present stockholders of this company, as follows:.

To B. D. Harris ............................................ 300 shares
G. D. Harris ............................................ 300 shares
John Carlisle ............................................ 220 shares
G. W. Carlisle ............................................ 150 shares
George S. Richardson ................................... 26 shares
James C. Holden ...................................... 2 shares
L. Hinsdale ............................................ 2 shares

" 'The matter of negotiating a loan for the benefit of the company was also taken up, and a resolution authorizing the loan to the amount of $300,000, for which bonds were to be issued, was approved.'

"On the same day the directors voted: 'That the president and secretary of the company shall arrange for the sale of the $300,000 bonds, aforesaid, in their discretion, at the best price obtainable, and the proceeds thereof shall be applied to the cancellation and retirement of $60,000 first mortgage 7 per cent. bonds, dated January 1, 1884, now outstanding; also to the payment of all floating indebtedness incurred up to the date hereof for materials and construction, and the balance shall be used by the directors for the best interests of the company.' They also passed the following resolutions: 'Whereas, at the annual meeting of the stockholders of this company a resolution was adopted requesting the directors to issue additional capital stock of this company to the amount of $100,000.00, to be divided pro rata among the present stockholders, and based upon the fact that during the last five years more than $160,000.00 of the net earnings of the company have been expended for permanent improvements and betterments, thereby adding that amount to the assets of the company which belong to the stockholders of the company: Therefore resolved, that the president and secretary of this company are hereby directed to issue one thousand shares of the capital stock of the company to the present stockholders in proportion to the amount of stock already owned by them, respectively.'

"A transaction took place among the stockholders as such and the directors as such, as shown by the following extracts from the records of the company:

" 'Proposition of Stockholders of the Great
" 'Western Mining and Manufacturing Company
" 'to the Directors of said Company.

" 'Whereas, the directors of the Great Western Mining and Manufacturing Company have taken steps to borrow the sum of $300,000. to be used in payment of existing indebtedness of the company and to provide additional working capital, etc., and have authorized the President and Secretary to execute

bonds for said amount, and to negotiate the same at the best price obtainable; and

"'Whereas, we are informed that it will probably be possible to find purchasers for said bonds at the price of eighty-five per cent. of the par value thereof, provided that stock of the company, to the extent of fifty per cent. of the par value of the said bonds shall also be transferred to the several purchasers of said bonds; and

"'Whereas, it is deemed to be inexpedient to issue any new stock of the company for such purpose, and desiring to do all we can to assist the directors in procuring said loan and the sale of said bonds:

"'We therefore make this proposition to the directors of the company in reference to the sale of stock held by us in said company, to the purchasers of said bonds, to wit:

"'We will sell to the several purchasers of said bonds of the company stock of the company belonging to us in the amounts set opposite our names, respectively, and will furnish to the Secretary of the company certificates of said stock, assigned in blank, to be by him delivered to said purchasers of said bonds, upon the understanding and agreement that we are to receive the sum of $50 for each share of stock so sold by us out of the money paid for bonds, and said Secretary shall act as our agent in receiving said amounts, and shall pay us the same before the company shall be entitled to have the remainder of the money paid for said bonds by the purchasers thereof.

"'This action is not to be construed as a proposition to sell said stock to the company, but it is to be treated and regarded as a sale of stock directly to the purchasers of said bonds, to be paid for by them to us, and the payment by them to the Secretary of this company for said bonds shall be regarded as a payment to us for said stock to the extent necessary to pay us therefor upon the terms above stated.

"'In testimony whereof, we have hereunto set our hands, on this third day of May, 1889.

| | |
|---|---|
| B. D. Harris | 450 shares |
| G. D. Harris | 450 shares |
| John Carlisle | 336 shares |
| Geo. S. Richardson | 39 shares |
| G. W. Carlisle | 225 shares |
| Total | 1,500 shares |

"'After full consideration of the proposition, the same was accepted, and the secretary was authorized to act as the agent for said stockholders in the proposed sale of their stock and the collection of the purchase money therefor, and directed to turn over the net proceeds of the sale of bonds into the treasury of the company.'

"A mortgage was made, and $300,000 of bonds bearing 6 per cent. semiannual interest were issued, dated June 1, 1889, and sold in several various amounts, with half as much stock transferred in blank, and deposited ratably by the stockholders with the treasurer, who delivered it with the bonds to the takers of them respectively. The stock of the testator was transferred at various times between September 7, 1887, and March 7, 1890. Of the money received by the treasurer for the bonds and stock, 25 per cent., being 50 per cent. of the stock, was paid by the treasurer to the several stockholders furnishing the stock. The testator furnished 450 shares of the stock, and received $22,500 of the proceeds of the bonds and stock in that manner. All the stockholders received $75,000, and the corporation retained $180,000. The avails of the loan, $225,000, were entered as such on the books of the corporation, and the $75,000 paid to the stockholders was entered as an expense of the loan. The $22,500 was sent to and received by the testator, and this bond transaction was closed in 1890. The business of the corporation was continued, debts were created, dividends were declared, and paid to those holding the stock that went with the bonds, but none to the testator upon his original stock after January 1, 1891; and interest coupons from the bonds were paid till 1892, when the receiver was appointed, on a creditors' bill, by the Circuit Court of the United States for the District of Kentucky. The mortgage was foreclosed

by intervention in that suit, and the property covered by the mortgage was sold for $70,000, and the other property for $5,666.67. The avails of the mortgaged property, after deducting expenses, were applied on the mortgage debt, leaving the remainder thereof, amounting to more than the face of the bonds still due. The other debts amounted to $122,221.32."

The reasoning of the court, upon which it reached its conclusion, is as follows:

"The substance of the plaintiff's claim is for the withdrawal of the money received for the mortgage bonds, and not for the increases of stock, and the question of solvency would refer to the situation at the time of the withdrawal. The prior debts had been then, or soon were, paid, but the mortgage bonds were outstanding, and the avails of them were what paid the prior debts. They were debts of the corporation, and in view of the whole situation, as shown by the evidence, they amounted to as much at least as the corporation could at most pay, and the depletion of any part of the $75,000 that came, from the corporation would be more than it could spare. The increases of stock were far within the limits of the power of the corporation, and these issues of it ratably to the stockholders would in themselves work no harm. The stockholders would, as between themselves, own the corporate property in the same proportions as before. Outsiders would not be affected till reached. Then they would be entitled to stand upon their rights to protect themselves. The first increase of stock was made more than a year before there appears to have been any suggestion of using stock to effect a loan, and to have been entirely separate from the bond transaction. When made and ratably divided, it would not of itself affect at all the stockholders as between themselves or outsiders. If sold to others, whether it was valuable or not, or at a fair or unfair price, the corporation would not be pecuniarily affected. If it brought 25 cents of the 85 cents on the dollar of the face of the bonds that the stock and bonds brought, that part would belong to the stockholder furnishing the stock, and not to the corporation; and the receiving of that by the stockholders would not be depleting the assets of the corporation. The bonds would not float at 60. The bonds and stock would at 85. The inference follows that the bonds brought 60 and the stock 25. The stockholders and directors agreed to this among themselves each with the others, and that would confirm the division, for, although directors may not contract away to any of themselves more than to others the property of the corporation to the detriment of creditors, they are not precluded from dealing fairly with any of their number in respect to what is his own. This deal may not have been fair to the takers of the bonds and stock for want of value to the stock, but the point here is whether there was a fair division between the corporation and the stockholders of the avails of the transaction as it was, fair or unfair, according to the proportion of the consideration furnished by each. The amount received for this issue of stock, in this view, was $25,000, of which the defendant's testator received $7,500 as the price of the stock furnished by him that did not come from the last issue, but had been divided to and became his before any negotiation of the bonds as well as any of his prior stock had. The last issue of stock was concurrent with the issue and negotiation of the bonds and stock, and that stock moved as much from the corporation to the new bondholders as if it had been issued directly to them, instead of through the prior stockholders to the bondholders. Neither the statement in the vote of this stock that it was based upon the expenditure of net earnings for permanent improvements, nor the provision in the proposal of the stockholders that the secretary should act as their agent in transferring the stock and receiving the money, nor the protest that the action should not be construed as a sale of the stock to the company, but should be regarded as a sale to the purchasers of the bonds, could alter the nature of the transaction, or its source, or its place, as a part of the consideration for the money received from the bondholders. The whole moved from the corporation, and the transaction wrought a depletion of assets of the corporation needed to make the bonds good, and to which the bondholders were entitled, if necessary, for the payment or security of the bonds. There was no agreement between the stockholders and the bondholders as to the price of the

stock nor otherwise, except among the stockholders themselves. As to the bondholders, according to the evidence, it was a mere bonus to float the bonds. The stockholders receiving the money took it with the risk of its being required to make the bonds good. It is so required, and the plaintiff, as receiver, represents the rights of the bondholders as creditors in respect to it. Briggs v. Spaulding, 141 U. S. 132 [11 Sup. Ct. 924, 35 L. Ed. 662]. The avails of this increase were $50,000, of which the testator received $15,000."

Great Western Mining & Mfg. Co. v. Harris' Estate (C. C.) 111 Fed. 38.

The court thereupon held that the testator's estate was liable for the amount of $15,000 received by the testator through the last issue of stock. The court reached this conclusion upon the theory that the stock issue of 1889 was in so far a part of the bond transaction that the legal effect was the same as though the stock had been issued directly by the corporation to the purchasers, and that, therefore, to that extent, said issue operated as a withdrawal of the assets of the corporation. But this arrangement was made in fact as well as in form by the stockholders for the sale not of the capital stock of the corporation, but of the capital stock issued to and owned by them, respectively, as a method of disposing of the bonds. It would seem that, inasmuch as before said stock issue the stockholders owned the entire equity in the assets of the corporation, and all received their proportionate shares of additional capital stock, that the only reduction in value was the reduction in value of the shares previously owned by them. As is said by counsel for defendant in his brief:

"After the issue they [the stockholders] owned the same thing. They gained nothing and the corporation parted with nothing by the issue of additional stock. It merely placed in the hands of the stockholders an instrument whereby they could conveniently detract from the value of the shares of stock which they formerly held, in order to vest new and equal rights in the persons to whom they might transfer the new shares. Whatever of value passed to the purchasers of those shares was withdrawn, not from the assets of the company, but from the antecedent equity or interest which was vested in the stockholders making the sale. Taking the stock transaction by itself, it did not affect the company in any way. It merely diminished the relative interest in the corporation of those stockholders who engaged in it."

The People ex rel. The Union Trust Company v. Michael Coleman, 126 N. Y. 433, 27 N. E. 818, 12 L. R. A. 762.

But, irrespective of these considerations, the controlling question herein is as to the right of the receiver to bring this suit. The Kentucky court, in the exercise of its general equity powers, appointed him receiver of the property and assets of said corporation to hold and keep its property, and directed him to institute suit for the advantage of said company in his own name as receiver or in the name of the company.

In Hale v. Allinson, 188 U. S. 56, 68, 23 Sup. Ct. 244, 47 L. Ed. 380, Mr. Justice Peckham, referring to Booth v. Clark, 17 How. 322, 15 L. Ed. 164, says:

"It was there held that an ordinary receiver could not sue in a foreign jurisdiction, and an elaborate examination was made by Mr. Justice Wayne of the principles upon which the decision was founded. In speaking of the right of a receiver appointed under a creditors' bill in New York to bring an action in a foreign state, it was said, in the course of the opinion, as to such a receiver: 'Whether appointed as this receiver was, under the statute of

New York, or under the rules and practice of chancery as they may be, his official relations to the court are the same. A statute appointment neither enlarges nor diminishes the limitation under his action. His responsibilities are unaltered. Under either kind of appointment he has at most only a passive capacity in the most important part of what it may be necessary for him to do, until it has been called by the direction of the court into ability to act. He has no extraterritorial power of official action; none which the court appointing him can confer with authority to enable him to go into a foreign jurisdiction to take possession of the debtor's property; none which can give him, upon the principle of comity, a privilege to sue in a foreign court or another jurisdiction, as the judgment creditor himself might have done where his debtor may be amenable to the tribunal which the creditor may seek.' This statement has not been overruled or explained away by any subsequent decision of this court to which our attention has been called."

See, also, Evans v. Nellis, 187 U. S. 271, 23 Sup. Ct. 74, 47 L. Ed. 173; Finney v. Guy, 189 U. S. 335, 23 Sup. Ct. 558, 47 L. Ed. 839.

The order appointing the receiver herein did not, in terms, authorize him to institute suits in a foreign jurisdiction. Had it done so, his position would be like that of the receiver in Hilliker v. Hale, 117 Fed. 220, 55 C. C. A. 252, where this court said:

"He was made an arm of the court, with which the court attempted to reach outside its territorial jurisdiction; and the attempt, it seems to us, was futile. The court could not reach beyond the limits of its jurisdiction, through a receiver, any more than it could through a marshal or a sheriff."

It is clear, therefore, that this receiver cannot maintain this suit in this court as receiver. But it is urged that, irrespective of his right to sue as receiver in a foreign jurisdiction, he may maintain such suit in the name of the corporation. The preliminary question before us is not as to the right of the corporation to bring a suit in its own name, within or without the state of Kentucky. In Glenn v. Marbury, 145 U. S. 499, 511, 12 Sup. Ct. 914, 36 L. Ed. 790, the Supreme Court said:

"As this corporation, notwithstanding it may have ceased the prosecution of the objects for which it was organized, could still proceed in the collection of debts, the enforcement of liabilities, and the application of its assets to the payment of its creditors, all corporate powers essential to those ends remained unimpaired."

The question before the court in that case was the technical one as to whether an assignee of a chose in action should sue in his own name or in that of the assignor, and the court held that under the common law prevailing in the District of Columbia said trustee could not maintain an action at law in his own name for a call or assessment of stock, but that such suit could have been maintained by him in the name of the company. The court states the rule to be "that a demand upon the stockholder to meet a call or assessment, by competent authority, must be enforced in the name of the person or corporation holding the legal title to the stock subscription, and to whom the promise of the stockholder was made." There the company had assigned by deed to trustees, for whom this plaintiff had been substituted, all its estate, including moneys payable, "whether on calls or assessments on the stock of the company" or otherwise, and the court had confirmed said deed, and entered an order for a call and assessment, and authorized said trustee to bring suit to collect said calls. The court,

therefore, in accordance with the rule laid down in Booth v. Clark, supra, and Relfe v. Rundle, 103 U. S. 222, 26 L. Ed. 337, held that the trustee, being vested with title by the voluntary act of the corporation itself by virtue of said assignment and the orders of the court pursuant thereto, was entitled to institute such suit in its name.

In Hilliker v. Hale, supra, this court considered the distinction between a receiver or trustee vested with a title which may be asserted anywhere and one who, as in this case, is a mere agent or officer of the court. Referring to the status of the receiver therein, we said as follows:

"We are further of the opinion that the plaintiff cannot maintain this action. He sues as receiver. His rights, if any, rest wholly upon the order and decree in the Rogers Case. Without regard to the nature of the claim asserted against the defendant, the plaintiff has no relation to that claim otherwise than through such order and decree. He is not the assignee of all or any of the creditors. He has no title to anything, so far as appears, except to his office as receiver. The order and decree, in terms, make him a mere agent of the Minnesota court. That court undertook to authorize him to sue nonresidents in other jurisdictions; moneys collected to be 'held by him subject to the further order of this court [the Minnesota court] in the premises.' The Minnesota court thus attempted to send its agent to collect money by suit outside of its jurisdiction, and to bring it back to be disposed of as it might direct. If it had had power to transfer the claim against the defendant to the plaintiff, and had in fact so transferred it, he could assert the title thus acquired, and sue upon such claim here, in accordance with the principles stated in Association v. Rundle, 103 U. S. 222, 26 L. Ed. 337. Apparently the court had no such power. Whether it had or not, it did not attempt to exercise it. It transferred nothing to the plaintiff. It merely appointed him its own agent to collect and hold subject to its order."

We think these considerations apply with equal force to the right of the receiver to maintain this suit in the name of the corporation. It does not appear that it has exercised its corporate powers so as to vest any title in the receiver or otherwise to authorize him to sue in its name. In the absence of such proof, the presumption is that he is acting without such authority. The sole authority shown by the bill is alleged as follows:

"That in proceedings in the United States Circuit Court for the District of Kentucky, L. C. Black, of Cincinnati, state of Ohio, was appointed receiver of the assets of your orator for the purpose of realizing upon the same for the benefit of its creditors, and by special order of said United States Circuit Court for the District of Kentucky he has been directed to prosecute this suit either in his own name or the name of your orator, as may be proper."

But if said court cannot send such an agent outside of its territorial limits to collect moneys as receiver, its attempt to exercise extraterritorial powers by directing such agent to proceed in the name of the corporation must be equally futile, except where the court by statute or otherwise is empowered to vest title in the receiver, or where the corporation, or the court, acting within its powers on behalf of the corporation or as the successor of its officers, has authorized such act. Hilliker v. Hale, supra; Great Western Telegraph Co. v. Purdy, 162 U. S. 329, 16 Sup. Ct. 810, 40 L. Ed. 986.

But even if it be assumed that this receiver, by thus bringing suit in the name of this corporation by himself as receiver, can maintain an action on its behalf which he could not maintain as receiver only, it

is not clear how this assumption would help the complainant corporation. It is, in any event, bound by the rules of law regulating the relations of a corporation to its officers, and, between it and its stockholders and directors, by its contract and the acts done in pursuance thereof.

A creditor, on the other hand, may by appropriate legal proceedings avail himself of every existing legal right against the corporate officers or stockholders. A contract between a corporation and its stockholders that they should not be called on to pay therefor in full is good between the corporation and its stockholders. The creditor defrauded by such a transaction may have such contract set aside. Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Clark v. Bever, 139 U. S. 96, 111, 11 Sup. Ct. 468, 35 L. Ed. 88, and cases cited. "An agreement that the subscribers or holders of stock shall never be called upon to pay for the same may be good as against the corporation itself, but it has been uniformly held by this court not to be binding upon its creditors." Handley v. Stutz, 139 U. S. 417, 428, 11 Sup. Ct. 530, 35 L. Ed. 227; Evans v. Nellis, supra. So, too, a receiver, if duly authorized to institute such a suit, is the representative of all parties interested therein. He is appointed in behalf of all parties who may establish rights in the cause. Booth v. Clark, supra. He may, as the representative of creditors, disaffirm acts of the corporation, and sue to set aside transactions entered into in fraud of their rights. In re Wilcox & Howe Company, 70 Conn. 220, 39 Atl. 163.

It may be that the acts and misrepresentations of Carlisle, the manager of said corporation, or of the brokers through whom the bond transaction was carried out, were in fraud of persons who became creditors upon the strength of said representations, and that an appropriate suit may be brought by such creditors to recover therefor. But this right is one existing not in favor of all creditors of a corporation, but in favor of a particular class of creditors only, namely, those creditors who were defrauded by said transaction. Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227; Coit v. Gold Amalgamating Co., 119 U. S. 343, 7 Sup. Ct. 231, 30 L. Ed. 420; Cook on Corporations (5th Ed.) §§ 42, 46. This suit cannot be treated as one brought to annul the contract whereby said transaction was carried out by creditors who may have been defrauded thereby. Neither the bill filed in the Kentucky court nor the bill herein charges that any purchaser of bonds or stocks was deceived by said action of the corporation, and there is no evidence to that effect.

The complainant is bound by the allegations of the bill, and the contention on which it is based that this is a suit only in the right of the corporation independent of its creditors, and to which neither the receiver nor the creditors are parties. We are of the opinion that such a suit cannot be maintained by this corporation. In Handley v. Stutz; supra, the bill was filed by certain judgment creditors against a Kentucky corporation for a stock assessment against certain creditors, in circumstances similar to those in the case at bar. Referring to the claims of the bondholders who were to receive a certain amount of stock as bonus, the court holds that such transactions can only be impeached for fraud, and that only subsequent creditors who were en-

titled to enforce their claims against these stockholders, and trusted the company upon the faith of said increase of stock, could enforce their claims against such stockholders, and that no such equity exists in favor of creditors whose debts were contracted prior to such authorization. So, in Coit v. Gold Amalgamating Co., supra, in a suit by a judgment creditor to enforce an alleged personal liability of the stockholders for fraud in issuance of unpaid stock, Mr. Justice Field, speaking for the court, said:

"The plaintiff had placed no reliance upon the supposed paid-up capital of the company on the increased shares, and therefore has no cause of complaint by reason of their subsequent recall. Had a new indebtedness been created by the company after the issue of the stock and before its recall, a different question would have arisen. The creditor in that case, relying on the faith of the stock being fully paid, might have insisted upon its full payment. But no such new indebtedness was created, and we think, therefore, that the stockholders cannot be called upon, at the suit of the plaintiff, to pay in the amount of the stock, which, though issued, was soon afterwards recalled and canceled."

It would seem that, inasmuch as it was agreed as part of the contract between the corporation and its stockholders that the stock should be deemed full paid, the stockholder could not be held liable in a suit by the corporation wherein it seeks to annul its contract as a fraud upon the general creditors of the corporation. The language of Mr. Justice Peckham in Hale v. Allinson, supra, referring to a contract of subscription, is illustrative of the relation of the parties. The court says:

"Assuming the contractual character of the subscription to the stock of the corporation, the right of the receiver to maintain this suit is not thereby made plainer. The contract may have been to pay, in the event of its insolvency, to the creditors of the corporation, the amount for which the shareholder might be liable up to the par value of his stock. That was a contract in behalf of the creditor, with which the corporation had nothing to do, and the statute did not make this liability assets of the corporation or confer upon the receiver appointed in the case the right to proceed to enforce it."

We have, then, in this case, a suit brought in the name of a corporation, wherein it seeks to repudiate, on the ground of fraud, certain contracts made by it with its officers and stockholders, which, so far as the record shows, was lawful in its inception. Whether it could in any case disaffirm its contract, and seek to recover the fruits thereof, without restoring the parties to their original status, it is not material to inquire. Scovill v. Thayer, supra. It is clear that it is not the proper party to maintain this suit. The corporation was a party to the contract, whereby it was agreed that no payment should be required upon said issues of stock. The evidence shows that the bonds could not be floated without a stock bonus, and, there being no stock in the treasury of the company, the stockholders contracted with said company to sell to the bond purchasers directly their own stock, pro rata, in order to provide such bonus. It may be noted in this connection that there is some evidence tending to show that the officers of the company made this contract in good faith, believing it to be for the benefit of the company. So far as these defendants' testator is concerned, while there are some expressions in his letters which are capable of being interpreted as evidence of an intent to secure a bene-

himself as stockholder at the expense of the corporation, yet .deuce, taken as a whole, falls far short of proving that he was .rty to any unlawful scheme, or believed that the plan which was ..opted for floating the bonds and selling his stock to the purchasers of bonds was either actively or constructively fraudulent.

In Foster v. Seymour (C. C.) 23 Fed. 65, 23 Blatchf. 107, Judge Wallace, upon a demurrer to a bill, had occasion to consider a claim made by a stockholder against a corporation and its trustees to require the latter to account to the corporation for a disposition of its capital stock alleged to have been fraudulent. The allegations of the bill presented a state of facts quite similar to those established by the evidence herein, so far as the issue of capital stock and its sale to the public operated as a fraud upon the public and future purchasers of the stock. He says:

"The transaction, as alleged, was a fraud upon the public. It was equivalent to an overissue of stock by a corporation to its stockholders. It was calculated to lead parties dealing with the corporation in ignorance of the facts to believe that it had a paid-up capital stock of $10,000,000, and representing a corporate fund of that amount invested in mining property. By putting out the scrip, the trustees represented to the public, who have no means of knowing of the private contracts made between a corporation and its stockholders, that the capital stock had been subscribed for and paid in. It was not a fraud upon the stockholders, however, because there were none; nor necessarily upon persons subsequently becoming stockholders, because the stock was full-paid stock, and not liable to any further calls in the hands of those who might purchase it. Scovill v. Thayer, 105 U. S. 143 [26 L. Ed. 968]. A purchaser of the stock would not be injured by the transaction unless he paid more for it than it was worth; and every purchaser would stand upon the particular circumstances of his purchase. If the original transaction, in connection with the special facts of a purchase of stock, should operate as a fraud upon a purchaser, the cause of action would be his, and not that of the corporation. The fraudulent character of the transaction was imparted to it by the corporation itself; that is, by those who represented all there was of the corporation. The remedy of the complainant, if he has been deceived into the purchase of stock by false representations as to its value, is against those who have misled him. Even if he could recover against the corporation or against the trustees (see Fosdick v. Sturges [Fed. Cas. No. 4,956] 1 Biss. 255), the corporation has no cause of action against the trustees."

See, also, Flagler Engraving Machine Co. v. Flagler (C. C.) 19 Fed. 468, 470.

We have thus fully discussed the point because the brief of complainant's counsel asserts that, even if the stock had had some value, "the transaction would nevertheless have been a fraud upon the prospective bondholders and stockholders whom they were inducing to enter the company," and further contends that the prospective bondholders and purchasers were led by resolutions, representations, and reports of the officers of the company to believe that the money which they were about to pay for the bonds and stock would, after payment of the debts, be devoted to the interests of the company and the improvement of the plant.

In stating these conclusions we do not wish to be understood as holding that the transactions complained of may not have been grossly fraudulent, to the prejudice of certain creditors of the corporation; nor do we question the doctrine that the assets of an insolvent corporation are impressed with a trust for the payment of its debts, and can-

not be withdrawn by the stockholders without providing for such debts, as held by the court below. Assuming the facts found by the court below, we think the receiver has misconceived his right, and acted beyond the scope of his authority in thus bringing this suit in the name of the corporation.

The bill further alleges that the defendant Harris "permitted and directed him [Carlisle] to pay dividends on all of the shares of stock in said company, except those standing in the names of said John Carlisle and George W. Carlisle, his brother, and accordingly such dividends were paid by said John Carlisle to sundry persons, but the names of said persons and the amount paid to each of them are to your orator unknown." The claim that the estate of B. D. Harris is liable therefor appears to have been abandoned in the court below. The admission and contention of the receiver in this court is stated in his brief as follows: "For the amount that B. D. Harris actually received, his estate should be made to account. For what he paid others the action has probably abated." The bill does not charge that Carlisle paid any dividends to Harris between 1889 and 1892. It is admitted that no dividends were received by Harris after January 1, 1891. Even if dividends were received by him between 1889 and 1891—a question as to which the evidence is indefinite—such dividends were paid at a time when the company was a going concern, and without any open present evidence of insolvency. Furthermore it is not alleged nor shown that Harris knew that such dividends, if paid, were not paid out of the earnings of said corporation, or that he did not receive them in perfect good faith. The date of insolvency alleged in the bill was 1892, and it appears that in 1889 all outstanding debts had been paid. In these circumstances the estate of B. D. Harris is not liable in this suit by the corporation. McDonald v. Williams, 174 U. S. 397, 19 Sup. Ct. 743, 43 L. Ed. 1022; New Hampshire Savings Bank v. Richie, 121 Fed. 956, 58 C. C. A. 294.

The decree of the Circuit Court that the complainant is entitled to the sum of $15,000 is reversed, with costs, and the cause remanded to said court, with instructions to dismiss the bill with costs.