FLAGLER ENGRAVING MACHINE Co. *v.* FLAGLER and others. (Two Cases.)

*(Circuit Court, D. Massachusetts.* February 21, 1884.

1. JOINT STOCK COMPANY—FRAUD OF DIRECTORS—BY WHOM SUIT TO BE BROUGHT.
    Where the organizers of a joint stock company put in as a part of the capital stock certain patent rights, and by fraudulent puffing induced others to purchase the stock at factitious rates, *held,* that whether the purchasers could set aside the sales or not, they were not entitled to gain control of the company and pursue their remedy against the fraudulent directors in the corporate name.

2. MASTER'S FINDING AFFIRMED.

In Equity.

*Ball, Storey & Tower,* for complainant.

*N. B. Bryant* and *J. M. Baker,* for defendants.

LOWELL, J. These suits in equity come up upon the report of Mr. Merwin, as special master. Both are brought by the Flagler Engraving Machine Company, a corporation established under the laws of Connecticut, but having its business in Boston, against the same defendants. In the second, and more important, case, the company complain that the defendants, Flagler, Bartlett, and Chaffee, in January, 1880, conspired together to form, and did form, the plaintiff corporation, with a capital of $300,000, divided into 3,000 shares of the par value of $100 each, and put into the company as its capital stock certain rights and interests under letters patent of the United States, numbered 174,715, and 191,821, of inconsiderable value, very much less than $300,000; that of the 3,000 shares, Flagler received 1,425, and each of the other defendants 663; that the defendants were duly elected directors of the company, and that Flagler was elected president, Bartlett secretary, and Chaffee treasurer; that afterwards the defendants voted to authorize Flagler, as president, to convey to A. S. Sullivan, of New York, as trustee for a corporation called the New York & London Metal, Wood & Stone Working Company, all the patent rights and interests of the complainants, and that they were conveyed accordingly, so that the complainants cannot tender the respondents a reconveyance of those rights and interests; that the complainants are not bound by the fraudulent acts of the defendants, and are unwilling to accept the patent rights in payment for the shares of capital stock issued to the

defendants, and demand the par value of the shares in money, less the value, if any, of the patent rights.

The case has been argued upon several issues besides that raised by the bill, which is that the defendants are bound to pay the par value of their shares in money. The facts, as found by the master, are that Flagler owned an exclusive license for the United States to use the inventions of one Atchison, described in the patents referred to, for working on metals. He likewise owned foreign patents for the same inventions in Great Britain, Canada, France, Germany, Italy, and Belgium, and the right to obtain patents in all other foreign countries. One Benyon, of Boston, and a corporation in Chicago, owned, respectively, the exclusive rights for the United States to use the invention in working wood and stone. The value of the right for wood working is estimated, by the person best informed upon the subject, at about $20,000; the right to work upon metals and upon stone are of some value, but the master cannot estimate the former, and the evidence gives none of the latter; but they are, probably, together, of less value than $20,000. In January, 1880, Flagler gave the other defendants to understand that the machine would do much more important and complicated work than it could really perform. He showed them a watch which he said was engraved by the machine, but which was, in truth, made by hand. The machine would only do frost work, or "matting," which was, comparatively speaking, of little value to the trade. One firm had paid a royalty of about $275 a year to the inventor, Atchison, for three years, for the use of one machine, but the fashion had changed, and they had not renewed their contract after 1878. The master finds that the defendants Bartlett and Chaffee were deceived by Flagler, and honestly believed that the patent right might be made to earn a fair income on $300,-000. The three defendants organized a corporation under the laws of Connecticut, and put the patent rights in as the capital. They gave 250 shares to the company itself, as "treasury stock," and kept the remainder, as alleged in the bill. The master finds that the law of Connecticut, at that time, permitted property to be used as the capital of a corporation. The defendants, acting for the company, employed a broker to sell the treasury stock, and published advertisements in which the value of the patent was set forth in the most glowing terms; and some positively false and fraudulent statements were made in these advertisements, with the assent of all the defendants. By these means a great demand for the shares was created, and they were all sold in a few days. It is plain, I think, and I do not understand it to be questioned, that every person concerned understood that the patent was the capital, and that the nominal value of $300,-000 was merely arbitrary. Indeed, the advertisements represent it as much too small a valuation. No one says that he understood $300,000 had been paid for the property. The sales were made upon the representations of what the machine would accomplish, and of

the demand for machines by jewelers and others; and the prices at which the shares were taken varied from $100 to $300, and even more, in which the nominal capital of the company was simply the point of departure. The money received for these 250 shares was put into the treasury of the company. The defendants, as directors of the company, passed a vote in February, while the sales of treasury stock were going on, to sell 300 shares more, and pay the proceeds to Flagler for his rights in foreign countries. About 195 shares were sold, and from this source the defendants received the only money which came to them at any time. These shares were contributed by the defendants, and the proceeds were divided among them in proportion to their several holdings of shares. The money passed through the hands of the treasurer of the company. The defendants gave the shares to the company and took back the proceeds at the same time, but left with the company, or subject to its order, the patents and patent rights for foreign countries. The occasion for passing a vote to authorize the sales of shares appears to have been that there was some agreement not to sell shares without the consent of the company. The defendants then gave the company the foreign interests in exchange for a permission to sell some of their own shares.

From this statement of facts it appears that certain persons were probably induced to buy stock by false and fraudulent representations; and for this wrong I do not doubt that there is a remedy. But I cannot see how the company itself can work out the remedy. There was no contract that the defendants should pay for their shares in money, and no such contract can be set up by estoppel, because no one ever supposed that they had made any such; nor is it true, nor did any one suppose, that they warranted the property to be worth its nominal estimated value. The actual fraud was not in fixing the capital stock at a certain sum, but in puffing the property afterwards; and the persons who suffered were those who were induced to buy shares in the market. The shares were not subscribed for at par, but bought. The purchasers, some or all of them, may have a right to set aside the sales, and to recover their money of the company or the defendants, or both, but they are necessary parties to the suit or suits, and they cannot, by obtaining control of the company, set up an artificial case and recover through the company what is really their own loss, from which the company itself was enriched. This is the view which the master takes of the case, and I concur in it.

In the other suit, the company assuming that it was legally organized and is to continue its corporate existence, asks an account from the defendants, its former officers, of the money paid into the treasury for the 250 shares of "treasury stock." The master finds that this sum was $32,130. The plaintiffs insist that it was a larger sum; but I cannot find that the master has made a mistake in this respect. When the present managers obtained control of the com-

pany, the money turned over to them was between $5,000 and $6,000. The remainder had been paid out. The principal items of payment are connected with the New York company. The defendants, encouraged by their extraordinary success in selling shares in Boston, determined to set up a company in New York, and, in addition to the patent rights which they already owned, to procure a transfer to the New York company of the right to use the patented invention in working wood and stone, which were owned by other persons. The several parties were to take the stock in the New York company in certain proportions. A company was organized under the law of Connecticut, and established in New York, and rooms were fitted up there in which the machine was exhibited in its operation upon wood and stone. Few buyers of stock were found, and the enterprise has not proved successful. The plaintiff company advanced to the New York company the money necessary to fit up the rooms and do the other things supposed to be necessary for the successful launching of the new corporation. The master finds that this is a debt against the New York company, and that the loan was justifiable. This decision I understand to rest upon the assumption, which is necessary in this case, that the plaintiff corporation is not to be dissolved, but has an existence as a company engaged in dealing with certain patent rights. From this point of view, the master considers that the company had reason to expect a return and repayment of the money expended in aid of the New York company. I affirm this finding. I note that all, or nearly all, the shareholders appear to have known of this enterprise, and that no one objected to it.

I disallow, as against the treasurer, Mr. Chaffee, and the defendant Flagler, a sum negligently paid by the former to the latter, for machines already once paid for, $750. I disallow one-half of the charges for advertising, because a considerable part of the sales were for the benefit of the defendants, as I have shown. I disallow one-half of the $500 paid to Mandell, because I think so much of it was paid for a certificate of value which was exaggerated, and only the other half for work done. In other respects, the report of the master is confirmed.