STRATTON'S INDEPENDENCE, Limited, v. DINES et al.

(Circuit Court, D. Colorado. January 6, 1904.)

No. 4,400.

1. PLEADING—ANSWER—SPECIAL DEFENSES.

Under the provision of the Colorado Code that the defendant may set forth by answer as many defenses as he may have, it is no objection to a special defense pleaded that the matter it covers may be given under the general issue.

2. FRAUDULENT REPRESENTATIONS—RIGHT OF ACTION FOR DAMAGES—CORPORATION.

An English corporation organized to take over mining property in Colorado, by the sole owner thereof, who conveyed the property to the corporation, and received all the issued stock, except seven shares, of one pound each, which were allotted to seven other persons nominated by him, and associated with him in the organization for the sole purpose of complying with the English companies acts, cannot maintain an action against him to recover damages because of alleged false representations made by him to his associates with respect to the value of the property.

3. SAME—ACTION FOR DAMAGES—DEFENSES.

Allegations in the answer in an action to recover damages for false representations in a sale of property by defendant to plaintiff showing that plaintiff did not purchase in reliance upon such representations, but upon information obtained from an independent source, state a good defense.

4. SAME.

Facts pleaded in the answer in such an action which tend to negative the falsity of the representations alleged in the complaint are proper matters of defense.

5. EXECUTORS—ACTIONS AGAINST—COLORADO STATUTE.

Under the statute of Colorado relating to the appointment and powers of executors (Mills' Ann. St. § 4687 et seq.), as construed by the Supreme Court of the state, an action cannot be maintained against the executors named in a will on a claim against the testator prior to the time when the will has been probated, and such executors have qualified and received letters testamentary.

6. SURVIVAL OF CAUSES OF ACTION—LAW GOVERNING—PLACE WHERE CAUSE OF ACTION AROSE.

Where the complaint in an action against executors to recover for alleged false representations made by the decedent shows that the representations were made in England, the law of that country governs, and under such law the cause of action did not survive.

7. SAME—COLORADO STATUTE.

Mills' Ann. St. Colo. § 4810, which provides that "all actions at law [with certain exceptions] shall survive to and against executors and administrators," does not apply to a cause of action for tort, so as to change the common-law rule that such a cause of action does not survive the death of the person charged with its commission.

8. JUDGMENT ON PLEADINGS—POWER OF COURT TO ENTER.

The power is inherent in every court of record, in the absence of a statute prohibiting it, to render judgment on the pleadings, when the facts shown and admitted thereby entitle one party to such judgment.

At Law. On demurrers to answer.

C. J. Hughes, Jr., Thomas, Bryant & Lee (Guggenheim, Untermyer & Marshall, of counsel), for complainant.

¶ 3. See Fraud, vol. 23, Cent. Dig. §§ 17, 18.

McAllister & Gandy, Dines & Whitted, Macbeth & May, and Wolcott, Vaile & Waterman, for defendants.

RINER, District Judge. This case is before the court upon a demurrer to the second, third, fourth, fifth, and sixth defenses set out in defendants' answer. To clearly understand the questions presented by the demurrer to these defenses, it will be necessary to notice very briefly the allegations of the first cause of action set out in the complaint (Judge Sanborn having sustained a demurrer to the second cause of action), which are, in substance:

First. That the plaintiff is a corporation duly organized and existing under and by virtue of the laws of the kingdom of Great Britain, and entitled to do business in the state of Colorado by virtue of the compliance with the laws of the state relating to foreign corporations; that the defendants, and each of them, are citizens and residents of the state of Colorado; that the amount in controversy, exclusive of interest and costs, exceeds the sum of $2,000.

Second. That on the 2d day of February, 1899, Winfield Scott Stratton, of the county of El Paso and state of Colorado, was the owner of certain mining property therein described, located in the Cripple Creek Mining District, in what was then El Paso county, but which has since become Teller county by legislative enactment.

Third. That the plaintiff is an incorporated company, duly organized under the companies acts of the kingdom of Great Britain, and was duly registered as a limited company under said acts on the 29th day of April, 1899, with the objects stated in its registration, which are the regulations of the company, and among the objects for which the company was incorporated is the purpose of buying, selling, and dealing in mining properties in the state of Colorado; that the company was organized and incorporated for the purpose of purchasing, owning, and working the mining property described in the complaint, belonging to Winfield Scott Stratton, who was one of the promoters and incorporators of the plaintiff company.

Fourth. That, prior to the organization of the plaintiff company, Stratton, through himself and his agents, represented to the other promoters and proposed organizers of the plaintiff company that the mining property described in the complaint had exposed and in sight ore bodies to the value of $7,000,000, and thereby was reasonably worth the sum of $10,000,000; that if the promoters and organizers, together with himself, should organize the plaintiff company, he would cause the property to be conveyed to it in consideration of his receiving in cash from the company the sum of $10,000,000. And after said company had been completely organized, and had been registered as a limited liability company under the companies acts of the kingdom of Great Britain, Stratton personally and through his agents further represented to the officers, agents, directors, and stockholders of the plaintiff company that the property described in the complaint had exposed and in sight ore bodies to the value of $7,000,000, and thereby was reasonably worth the sum of $10,000,000. That, acting upon these representations, fully believing therein, and relying upon the same to be true and correct, the promoters of the company caused

the same to be organized, and, after the company had been organized, the officers and directors of the company paid to Stratton the sum of $10,000,000, in consideration of which Stratton, on or about the 23d of May, 1899, conveyed and caused to be conveyed to the company all of the mining property described in the complaint, and the same was received by the plaintiff company in consideration of its paying to Stratton the sum of $10,000,000. That thereupon the company entered into possession of the property,. and has been in possession ever since that time.

Fifth. At the time Stratton represented to the promoters and organizers of the plaintiff company, and, after the company had been incorporated and registered, represented to the officers, agents, directors, and stockholders thereof, that the property described in the complaint had exposed and in sight ore bodies to the value of $7,000,000, and thereby was reasonably worth the full sum of $10,000,000, he well knew that said representations were wholly false, and well knew that the property had not exposed and in sight ore bodies to the value of $7,000,000, and was not worth the sum of $10,000,000, and that in truth and in fact the property had exposed and in sight ore bodies to the value of not more than $2,000,000, and was worth not more than $4,000,000; that Stratton knew that the promoters and organizers of the company, before its organization, and the officers, agents, and directors of the company after the same had been organized and registered, were wholly ignorant of the actual value of the property, and well knew that they relied upon the representations made by him as to the value thereof, and, relying upon his representations, believed that the property had exposed and in sight ore bodies of the value of $7,000,000, and was worth the sum of $10,000,000.

Sixth. That after the company had been organized and registered, and after the conveyance had been made by Stratton, conveying to it all his right, title, and interest in and to the mining property described in the complaint, in consideration of the payment to him of $10,000,000, plaintiff entered into possession, and commenced mining operations thereon. That, by reason of the method by which the property had been mined by Stratton before the conveyance to the plaintiff, it was more than a year thereafter before the plaintiff had any suspicion or was able to ascertain that the mining property was not worth the sum of $10,000,000, as had been represented to it by Stratton. That it was many months before the facts in relation to the value of the property could be fully ascertained, and it was not until a short time previous to the bringing of this suit that all of the facts were fully ascertained, and the company had demonstrated that the property, at the time of sale to it, had exposed and in sight ore bodies to the value of not more than $2,000,000, and was not worth more than the sum of $4,000,000. That upon investigation the plaintiff ascertained that for the purpose of sustaining the allegations made to the promoters and organizers of the company before its organization, and, after its organization and registration, to the officers, agents, and directors of the same, that the property had exposed and in sight ore bodies to the value of $7,000,000, and was reasonably worth the sum of $10,000,000, Stratton had caused the same to be examined,

and an estimate made of its value and of the amount disclosed in said property at that time, and in making such examination of the property the same had not been honestly and fairly done, so as to show the actual value of ore disclosed therein, but the agents and representatives of Stratton, in making the examination, for the purpose of deceiving and defrauding the plaintiff, caused the samples taken from the mine to be salted, so that the estimate of the ore contained in the mine was fraudulently enlarged, and the report based thereon was fraudulent and misleading, and that this fraudulent and misleading report was presented to the promoters and organizers of plaintiff company prior to organization, and to its officers, agents, and directors after organization.

Seventh. That, by reason of the matters set forth in the complaint, the plaintiff had been damaged in the sum of $6,000,000, for which it asks judgment.

Eighth. That Stratton died on the 14th of September, 1902, leaving as his sole heir I. Harry Stratton, and that he also left a last will and testament, which named Carl S. Chamberlain, D. H. Rice, and Tyson S. Dines as executors of his estate, and it also named the defendants D. H. Rice, Moses Hallett, and Tyson S. Dines as trustees of his estate for certain purposes set forth in said will, and that afterwards, on the 29th of December, 1902, the county court of El Paso county (the same being the county in which Stratton died), being a court which, under the laws of the state of Colorado, had probate jurisdiction over his estate, admitted the will to probate, and appointed the defendants Chamberlain, Rice, and Dines as executors thereof, in accordance with the provisions of the will, and all of the property, real, personal, and mixed, which belonged to Stratton in his lifetime, has descended to, and is now and hereafter will be in possession of, one or more of the defendants just named.

To this complaint the defendants Carl S. Chamberlain (named in the complaint as Earl S. Chamberlain), D. H. Rice, and Tyson S. Dines on the 13th day of November, 1903, filed an answer, setting out therein six defenses to the cause of action stated in the plaintiff's complaint.

The first defense is a general denial, and is not demurred to.

The second defense admits that on the 27th day of April, 1899, Stratton was owner of the mining property described in the complaint. It then alleges: That on that day Stratton agreed to the organization of a corporation for the purpose of taking over the mining property in consideration of the shares of its capital to be allotted and issued to him. That he made and entered into a certain agreement in writing with one George Butcher, whereby it was agreed to register and incorporate a company with limited liability under the British companies acts, with capital of £1,100,000, divided into 1,100,000 ordinary shares, of £1 each, for the purpose of taking over and acquiring the mining properties described in the complaint. The contract provided that the name of the company should be Stratton's Independence, Limited; that 100,000 of the shares of stock should be reserved for working capital. It further provided that the consideration for the sale should be the sum of £1,000,000, to be satisfied by

the issuance and allotment to the vendor of 1,000,000 shares of the stock, to be credited as fully paid up, and numbered from 1 to 1,000,-000, inclusive, and upon completion of the sale the company was to have possession of the property. It then makes provision for a board of directors, and fixes their compensation, and sets out a description of the property to be conveyed. It is then alleged that on the 29th day of April, 1899, and in pursuance of the agreement just mentioned, and to carry out the terms thereof, Stratton's Independence, Limited, the plaintiff corporation, was created and incorporated under the laws of the kingdom of Great Britain; that the incorporators of the company were seven in number; that they were only nominally interested in the creation and organization of the company, and that each subscribed for but 1 share of the capital of the company, of the par value of £1 sterling, solely to comply with the requirements of the laws of the kingdom of Great Britain relative to the formation of corporations; that none of the seven incorporators had any intention of profiting by said incorporation; that they only became such incorporators and subscribed to such capital in order to create a corporation to which Stratton might convey the mining property described in the complaint in return for all of the issued shares of the stock of the company, other than the 7 shares which said nominal incorporators were obliged to hold; that, following the terms of the agreement just referred to, the capital of the company was fixed at the sum of £1,100,000 sterling, to be divided into 1,100,000 shares, of £1 sterling per share; that thereafter, and on the 4th day of May, 1899, in pursuance of the terms of the agreement, and to ratify and more fully carry out its provisions, the plaintiff company made and entered into an agreement with Stratton and Butcher (referred to in the answer as a supplemental agreement) by which the agreement between Butcher and Stratton was ratified, with the modification that the number of shares over which the vendor should have an option should be decreased by 7 shares, and that the 1,000,000 shares which by the terms of the original agreement were to be allotted to Stratton should be allotted and issued to him or his nominees, as he might in writing direct. That thereafter, on the 23d day of May, 1899, in pursuance of the two agreements just mentioned, Stratton made, executed, and delivered to the plaintiff company a deed conveying to the corporation all of the mining property described in the complaint, and that thereupon the company issued and allotted to Stratton, in consideration for the conveyance, the 1,000,000 shares of the capital stock in the plaintiff company issued fully paid and at par value, which constituted all of the capital of the company and all of the shares thereof, except the 7 shares which had been subscribed for by the nominal incorporators, and 99,993 shares which then and ever since have remained unsubscribed for, unallotted, and unissued; that the shares of capital so allotted and issued to Stratton was the sole and only consideration that Stratton, or any one representing him, then, or at any time, received for the property so conveyed by him (by reason of a typographical error, printed in the answer, "to him"); that while, in form, the transaction resulted in the conveyance by Stratton to the plaintiff corporation of all of the mining premises described in

the complaint, nevertheless, in truth and in fact, the same constituted but a change in the manner whereby Stratton held the ownership and possession of the property, he having conveyed the same to the corporation as an individual, and, as the owner of all of the stock in the company allotted and issued and held in good faith, he took over the same in the name of the corporation; that at the time the property was acquired from Stratton, and at the time the shares were allotted, nor at any time since, did the plaintiff company have any assets or property other than the mining premises it had acquired from Stratton; that, after the issuance and delivery of the 1,000,000 shares of capital stock, Stratton remained owner thereof for a long period of time, and upon the execution and delivery of the deed the plaintiff company entered into full and complete possession of the mining property, and has remained in full possession and enjoyment ever since. It is further alleged that, by reason of the matters set out in this defense, the plaintiff has not been damaged in any manner.

For a third defense, it is alleged, in substance, that the company, its officers, agents, and directors, did not rely or act upon any statement or representation made by Stratton or any of his agents concerning the mining property, the condition thereof, the ore disclosed therein, or its present or prospective value, either as alleged in the complaint or otherwise, and denies that the representations set out in the complaint were made by Stratton or any of his agents. It then alleges that full and ample opportunity to examine and survey the mining property described in the complaint prior to the conveyance by Stratton to the plaintiff company, and to inspect all books, papers, accounts, assay certificates, mill and smelter returns, ore shipped from the property, and pertaining to the operations of the mine for a number of years prior to the transfer, was given to the officers, agents, and directors of the plaintiff company, whereby to form their own opinion relative to the then condition and prospective value of the premises.

For a fourth defense, while denying that Stratton or his agents made the representations charged in the complaint, yet it is alleged that notwithstanding that fact, even if true, there could be no recovery against the plaintiff company, for since the date on which it entered into possession of the premises described in the complaint, and prior to the 1st day of August, 1903, it extracted and sold from the property ores of the value of more than $10,100,000, as shown by plaintiff's bill of particulars on file in this case.

For a fifth defense, the answer admits the death of Stratton; admits that Carl S. Chamberlain, D. H. Rice, and Tyson S. Dines were named in the will as executors of the last will and testament of Stratton, as alleged in the complaint; but denies that on the 29th of December, 1902, or at any time prior to the filing of this complaint, the county court of El Paso county admitted the will to probate, although it is admitted that that was the court having jurisdiction over the estate.

For a sixth defense, it is alleged that even if the alleged and pretended averments contained in the complaint on which the plaintiff bases its cause of action and right to recover the moneys referred to in the complaint from the defendants be true, as alleged in the com-

plaint (which is denied), the cause of action alleged and stated in the complaint as a basis of recovery against the defendants is a cause of action which accrued, if it ever accrued, during the lifetime of Stratton, and against Stratton, and that the same did not survive his death, and does not constitute any basis for a claim against the executors of his estate.

To each of the last five defenses, of which the foregoing is a brief summary, the plaintiff demurs on the general ground that said defenses, nor either of them, constitute a defense to this action. It was suggested at the oral argument, and again repeated in the brief of the plaintiff, that the second and third defenses should not be permitted to stand, for the reason that the same matter is pleaded in the form of a general denial in the first defense. The Code provides that the defendant may set forth by answer as many defenses as he may have, and I am inclined to the view that it is no objection to a special defense that the matter it covers may be given in evidence under the general issue. Western Union Telegraph Company v. Eyser, 2 Colo. 141. If the first defense, which is a general denial, contains redundant matter, that would, I think, have to be reached by a motion to strike the objectionable allegations from that defense.

### Second Defense.

In disposing of this demurrer, I will, for convenience, consider the several defenses in the order in which they are set out in the answer. This being an action brought by a corporation, the facts set out in the second defense, to my mind, constitute a complete defense to this action. The transaction, as disclosed by this defense, is this: Stratton was the sole owner of the mining property, the subject of this controversy; and after the organization of the corporation, and the transfer to it of the mining property, he became the owner of all of its issued stock, except seven shares which were allotted to other persons for the sole purpose of complying with the company's acts of England in relation to the organization of corporations, and, as the answer disclosed, were simply nominees of Stratton for that purpose, and were therefore in exactly the same position as Stratton himself. Stratton and these seven nominal shareholders were at the time of this sale the only members of the company. The company owned no other property except these mining claims, and I am unable to see how the company can complain of an act of which all of the members of the company were cognizant, and which they approved and confirmed. Whether what was done was done for the purpose of enabling the company to be passed off on the market as something different from what it was is, to my mind, wholly immaterial to the present question, for, even if that be true, the remedy is not an action by the company against the vendor. The remedy, if any exists, is a remedy of each purchaser of shares, if there were any such, who was deceived by the representations made by his vendor as to the condition of the company. This view is, I think, sustained by ample authority both in England and in this country. In re Ambrose Mining Company, Law Report, Chancery Division, vol. 14, p. 23, is an English case in point. There the owners of a mine determined to

convey it to a corporation. The mine and machinery were transferred to Eaton, a clerk; and thereafter, by an agreement between Eaton and Taylor, one of the principal owners of the mine, and one Hardy, Eaton agreed to sell the mine to Taylor and Hardy in trust for a company to be formed in consideration of £24,000 to be paid to Eaton in stock. The company was organized with a capital of £36,000, 18,000 shares at £2 each. The stock was issued through Eaton to the parties interested in the mine. The previous agreements made in contemplation of the organization of the corporation (as in this case) were ratified, and 6,000 fully paid up shares issued to Eaton, and 12,000 shares, upon which £1 had been paid, were issued. These shares were divided among the owners of the mine. The value of the mining property was considered by the court to be £6,000. The company was not successful, and passed into the hands of a liquidator, who applied for an order to proceed against the original property owners, charging them with having sold the property for more than it was worth, and calling upon them to pay the difference between the value of their shares and the value of the mine. On appeal, the court, speaking through James, L. J., said:

"It appears to me that one must look, even as between companies and directors, at what the substance of the transaction was, as between the company and the persons whom the company is seeking to make answerable. Now the transaction appears to me to be quite clear, and I cannot help thinking myself there was an object in it, and that object was not at all an object for attaining an undue advantage as between the company and the persons who were dealing with the company and selling to the company; but the obtaining an undue advantage in the stock market, wherever the stock market of the company might be, as between the persons who got the shares in the new company and the persons who were foolish enough to buy the shares from them in the new company. They intended to represent the thing as worth something a great deal more than it was worth, namely, the nominal capital that was attributed to it. Now, what we have got here to consider is a sale in substance made by the vendors for themselves, as beneficially interested, to themselves as directors of the company, being in that sense in a fiduciary character towards the company; and the sale is a sale by themselves in the one character to themselves in the other character. Of course, such a sale is a thing that cannot stand if it is questioned in time, and proper efforts made to restore the thing purchased. And if there is any difficulty in the way of restoration, if it is made out that they have received something beyond the proper price of the property, there ought to be no difficulty in making them pay that extra value. Suppose the property had been sold before the fraud was discovered, or suppose the cestuis que trustent laid out a great deal of money in improvements; then the only mode of setting it right would be to make the vendors give the extra price which was paid for it. According to my view of this case, the vendors did get no extra price from the company as a company. What the company got was the mine as it stood. The mine, machinery, plant, or whatever was on the property, was sold to them. Now, what they gave for it was a certain share in the mine, the very property itself, divided into a great number of shares. It was a certain share in the assets of the company—the assets of the company consisting only of the very thing which they had bought. * * * Under these circumstances, it seems to me impossible to say that, however wrong the transaction was in respect to other persons, there was anything wrong as between the company and the vendors. There was no fraud on the existing stockholders, because they were parties to it. There was no fraud on any future allottees of the shares, because there could be, under the circumstances, at the time the arrangement was made and completed, no future allottees of shares. The transaction was a transaction in which the whole of the capital

of the company was given in exchange for the property purchased. * * *
In my view, the company only gave back in substance that which it was
getting, and the fraud was not between the vendors and the company, the
purchasers, but was a thing calculated to delude people into believing that the
shares, when got, were something more valuable than they really were. I
rest my decision on the ground which was opened by the appellant's counsel
—particularly Mr. Buckley—that what was taken back was the very thing
that was given in exchange for it, calling it by different names and dividing
it into different shares."

The other judges concurred in holding that the transaction, as be-
tween the company and the organizers of it, was a valid one. I quote
somewhat at length from this case for the reason that the facts were
quite as strong in favor of the plaintiff as the facts alleged in the
complaint in this case now under consideration; it being suggested
by all three judges that it was probably the purpose of the organizers
of the corporation to commit a fraud upon subsequent purchasers of
the stock in the market, but holding, nevertheless, that the company,
whom the liquidator represented, could not maintain the action. There
are a number of other English cases to the same effect, all of which
I have examined carefully, but which I shall not now take the time
to review, but content myself with citing them in support of the propo-
sition decided in the case just referred to: In re Gold Co., L. R.
Ch. Div. vol. 11, p. 701; In re Salomon v. Salomon & Company, Ltd.,
L. R. App. Cases, 1897, p. 22; In re Baglan Colliery Co., L. R. Chanc.
App. Cases, 5, p. 346; Pell's Case, L. R. 5 Chy. App. 11; Drum-
mond's Case, L. R. 4 Chy. App. 772; In re British Seamless Paper
Co., L. R. 17 Chy. Div. 467.

The courts of this country have, I think, announced the same rule.
The case of Flagler Engraving Mach. Co. v. Flagler et al. (C. C.)
19 Fed. 468, was a suit brought by the company against several of
its directors. The plaintiff charged that the directors conspired to
form a corporation having $300,000 capital, divided into 3,000 shares;
that after the organization of the corporation the directors conveyed
to the company certain patent rights, receiving in payment therefor
the capital stock of the corporation; that the patents were of no
particular value; that 250 shares of the stock were paid into the
treasury, and the other shares were issued to the original incorpo-
rators; that the directors, after receiving the stock, sold the same
upon the market; that the sales were made by misrepresentation.
The suit was brought by the company to recover the difference be-
tween the actual value of the patent rights conveyed to it and the
par value of the shares in money. In disposing of the case, the court
said:

"It appears that certain persons were probably induced to buy stocks by
false and fraudulent representations, and for this wrong I do not doubt that
there is a remedy, but I cannot see how the company itself can work out the
remedy. * * * The actual fraud was not in fixing the capital stock at a
certain sum, but in puffing the property afterwards, and the persons who
suffered were those who were induced to buy shares in the market. The pur-
chasers, some or all of them, may have a right to set aside the sales, and to
recover their money of the company or the defendants, or both; but they are
necessary parties to the suit or suits and they cannot, by obtaining control
of the company, set up an artificial case, and recover through the company

what is really their own loss, from which the company itself was enriched. This is the view which the master takes of the case, and I concur in it.

The plaintiff's counsel, in their brief, admit that the stock was worth on the market, for many months after the transaction was consummated, and before the fraud was discovered, more than double its par value, so that few of the original purchasers lost any money, and that it was the last holders of the stock who really suffered damages. This being true, it brings this case clearly within the rule announced in the cases to which I have referred, and is conclusive of the plaintiff's right to maintain this action. Langdon v. Fogg (C. C.) 18 Fed. 5; Foster v. Seymour (C. C.) 23 Fed. 65; Stewart v. Railway Co. (C. C.) 41 Fed. 736; Great Western Mining Co. v. Harris (C. C.) 111 Fed. 38; Higgins v. Lansingh, 154 Ill. 301, 40 N. E. 362; Scoville v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, 35 L. Ed. 88; Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363; and Seymour v. Cemetery Association, 144 N. Y. 333, 39 N. E. 365, 26 L. R. A. 859.

In the brief filed on behalf of the plaintiffs, it is suggested that the contracts set out in the defendants' answer do not represent the entire transaction, and that it may be necessary for plaintiff, in reply to the affirmative matter set up in the first defense, to state more at length the entire transaction; that there were executed at the same time the contracts set forth in the answer were executed another contract, by which Mr. Stratton really never received any stock of the plaintiff company, but the stock was put in escrow and sold for the sum of $10,000,000, so that Stratton did receive $10,000,000 in cash for the property, which was the real transaction. While there is nothing in the pleadings now under consideration presenting such a question, yet, as counsel for the plaintiff have suggested it in their brief, it is perhaps not improper for me to say here that such a contract would not, in my judgment, change the situation, so far as this case is concerned.

## Third Defense.

The third defense denies that the plaintiff relied upon the statements or representations made by Stratton, but, on the other hand, made its own examination of the property, and acted upon the results of such examination; that full and ample opportunity was afforded the company, prior to the conveyance of the property, to inspect the books, papers, accounts, assay certificates, mill and smelter returns, etc., covering a period of several years prior to the transfer; and that the plaintiff possessed and acted upon information and facts derived from sources other than from Mr. Stratton or his agents. I think the rule is well settled that in cases of this character, to enable the plaintiff to recover, there must be false representations, and the purchaser must have purchased upon the faith and credit of such representations, to his damage; and a defense which shows that the purchaser not only did not rely upon the false representations charged against the vendor, but availed himself of the opportunity afforded him to make the fullest examination, and did make such examination, and as a result thereof purchased the property, if supported by proof,

126 F.—62

raises an effectual bar to the plaintiff's case, and is a good defense. Southern Development Company v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; Crocker v. Manley, 164 Ill. 282, 45 N. E. 577, 56 Am. St. Rep. 196; Weist et al. v. Grant, 71 Pa. 95; Van Weel v. Winston, 115 U. S. 228, 6 Sup. Ct. 22, 29 L. Ed. 384.

## Fourth Defense.

In the fourth defense it is alleged that, even though Stratton made the representations charged in the complaint, there can be no recovery in the case, for the reason that prior to August 1, 1903, the plaintiff had extracted and sold ores from these mining properties of the value of more than $10,100,000, and therefore it has sustained no damage. The plaintiff alleges that Stratton and his agents represented that the mining property had exposed and in sight ore bodies of the value of $7,000,000, and that the mine was reasonably worth $10,000,000, whereas, in truth and in fact, the property had exposed and in sight ore bodies of the value of not more than $2,000,000, and was worth not more than $4,000,000. I am inclined to concur in the views expressed by counsel for the defendants in their brief, that the statement made by Stratton, if it was made, to the effect that the property was worth $10,000,000, constitutes, in law, nothing more than the mere expression of opinion, and is not actionable. This, I think, is true from the very nature of the case. Whether or not the statement that there was $7,000,000 worth of ore in sight was also an expression of opinion, or a statement of fact, it is not necessary for the court here to decide. Under the allegations of this defense of the answer, I think we may treat it as a statement of fact, and yet the allegations of the answer would constitute a defense, for, as suggested when we were considering the third defense, two things must concur to entitle the plaintiff to recover: First, fraudulent or false representations in relation to the condition of the property; and, second, such representations must have constituted the basis of the sale on the part of the purchaser, by which he was in fact misled to his damage. Marshal v. Hubbard, 117 U. S. 415, 6 Sup. Ct. 806, 29 L. Ed. 919.

## Fifth Defense.

In the fifth defense it is alleged that at the time of the commencement of this action the defendants were not, and never had been, executors of the Stratton will; that the will had not been admitted to probate; that letters testamentary had not been issued to the defendants; therefore that the action was prematurely brought. At the oral argument I was inclined to doubt the sufficiency of this defense, and so stated to counsel; but, since receiving the briefs of counsel, and having my attention called more directly to the statutes of Colorado and some adjudicated cases, I am led to the conclusion that my first impressions of this defense were erroneous. It requires no citation of authority to the rule that courts of the United States, in enforcing claims against executors and administrators of a decedent's estate, are administering the laws of the state of the domicile, and are bound by the same rules that govern the local tribunals. As the court is called upon to decide the question in view of the construction

to be given to the statutes of Colorado, the state of the domicile, we will briefly notice some of the statutory provisions relating to the appointment and power of executors. Section 4687, Mills' Ann. St., provides that the power of the executor over the estate before the probate of the will and obtaining letters testamentary shall extend to the burial of the deceased, the payment of necessary funeral charges, and the taking care of the estate. Section 4689 requires every executor to take an oath at the time of proving a will. Section 4690 provides that all executors, unless the testator shall otherwise direct, shall, before entering upon their executorship, give a bond for the faithful discharge of their duties, in a sum double the value of the personal estate, together with the rents and issues occurring or to occur during the term of his office from such real estate as might by law be subjected to the payment of the debts of the deceased. Section 4682 provides that, after the will has been proven and admitted to record, the executor named therein, if there be one, shall be entitled to letters testamentary thereon. As throwing some light on the question of the construction to be placed upon the provisions of the sections of the statute just referred to, it is proper to note that section 4780, after enumerating certain claims which are to be preferred claims, provides that all other debts and demands, of whatsoever kind, without regard to quality or dignity, which shall be exhibited within one year from the granting of the letters, shall compose the fourth class. And section 4792 provides that creditors who may bring their actions in the district court at any time within one year from the issuing of letters testamentary shall share in the proceeds of the estate in the same manner as if such demands had been exhibited in the county court within the same time. Under these provisions of the statute, I think it is clear that prior to the granting of the letters the executor is without power to sue, because he is not an executor until he complies with the requirements of the statute; the statute taking the place of and abolishing the rules of the common law in relation to the settlement of the estates of deceased persons in Colorado. If, then, the executor, prior to taking the oath, giving the bond, and receiving the letters testamentary as provided by the statute, is without power to sue, is not the other proposition equally true—that no suit can be maintained against him? The only exception which might arise under these statutory provisions would be a possible controversy in relation to funeral charges or taking care of the estate. After a careful consideration of the statutes and the authorities to which my attention has been directed, I am led to the conclusion that a suit against these defendants could not be maintained prior to their qualification as executors. Gatfield v. Hanson, 57 How. Prac. 331; Perry v. Conroy, 22 Kan. 716; Armstrong v. Lear, 12 Wheat. 169, 6 L. Ed. 589.

## Sixth Defense.

Stratton having died before this action was brought, it is insisted by the sixth defense that the action does not survive against the defendants as executors. Counsel for plaintiff suggested in their brief that the record does not show where the cause of action arose; therefore

that this defense will have to be held insufficient, because it does not state facts tending to bring it within the rule contended for by counsel for the defendant, even though the fact is correct that the cause of action did arise, in England, and that the law of that country did not permit the action to survive. While it is true that the answer does not state that the cause of action arose in England, yet it is equally true that the complaint does not show that the cause of action arose in Colorado; and the demurrer, under the rules of pleading in Colorado, going back to all of the pleadings, might well suggest whether the complaint states a cause of action. I think, however, from a careful examination of the complaint in this case, that the only inference which can be fairly drawn is that the alleged false representations, if made, were made in England. The complaint states first that Stratton made the representations to the promoters, and that thereupon the promoters, including Stratton, formed a corporation under the companies acts of England; that when the corporation was formed, and prior to the conveyance of the property, he again made the representations to the officers and directors of the corporation; and that the salting of the mine was made the basis of a report which was furnished by him and submitted to the company. These occurrences must have taken place, if at all, in England, for at that time the company owned no property in this country, and, so far as the pleadings show, had no agent here, nor were any of the officers or directors residing here. This being true, I am inclined to think that the question of the survival of this action must be determined by the laws of England, and that under the laws of England the action does not survive. In re Duncan Terry v. Sweeton, L. R. Chan. Div. 1897, (1) 387; Phillips v. Homfray, 24 Chan. Div. 454; Kirk v. Todd, 21 Chan. Div. 484. If, however, the court is in error about this, yet I think it perfectly clear that the complaint, in its present form, does not state a cause of action, because it fails to show where the alleged fraudulent representations were made, and I do not think that the court is authorized to presume that they were made in the state of Colorado. But conceding that the complaint might be amended in this respect, and that the question is one to be determined under the provisions of the Colorado statutes, I am still inclined to the view that the action cannot be maintained against these executors. It is conceded by counsel upon both sides that this action is not founded upon contract. The action is in tort, and the question as to its survival must be determined according to the rules governing such actions. Section 4810 of Mills' Annotated Statutes—the only statute to which my attention has been directed, bearing upon this question—provides:

"All actions at law whatsoever save and except actions on the case for slander or libel, or trespass, for injuries done to the person and actions brought for the recovery of real estate, shall survive to and against executors and administrators."

There is a vast difference between actions and causes of action, and, in my judgment, this statute does not apply to a case like the case at bar. If the question is to be disposed of under the rules of the common law, there is, I think, no question but what the action does not sur-

vive. Reed v. Hatch, 19 Pick. 47; Henshaw v. Miller, 17 How. 212, 15 L. Ed. 222.

I have thus gone over the 2d, 3d, 4th, 5th, and 6th defenses, the objections to which were argued with so much earnestness and ability by counsel for the respective parties; and, while I have not taken the time to review in this memorandum all of the cases to which my attention was directed by the briefs of counsel, I have examined all of them, and the conclusion to which my mind has arrived is that the demurrer to each defense must be overruled.

As I understand this case, the second and sixth defenses set up in the answer are absolute defenses to this action, and I am inclined to the view that the defendants are now entitled to a judgment upon the pleadings, if they care to move for it. To prepare this case for trial would involve not only very great expense, but would greatly delay and embarrass the settlement of this estate; and in the end the court would, if the facts set out in these answers (which now stand admitted by the demurrers) were made to appear, feel in duty bound to instruct a verdict in favor of the defendants, thus presenting for a second time the identical questions which are now before the court. It may be that there is no statute of this state directly authorizing this proceeding. I have no question, however, but that, in the absence of a statute prohibiting it, the power of the court to enter a judgment at this stage of the proceedings in a case like this is a power inherent in every court of record. This view finds support in the case of Humboldt Mining Company v. American Manufacturing, Mining & Milling Company, 10 C. C. A. 417, 62 Fed. 356. It is true that in that case the question came up under an Ohio statute (Rev. St. § 5328) which provided:

"When upon the statement in the pleadings one party is entitled by law to judgment in his favor, judgment shall be so rendered by the court although a verdict has been found against such party."

In disposing of the assignment of error based upon the ruling of the court below sustaining a motion for a judgment upon the pleadings before verdict, Judge Taft said:

"It was in accordance with this section that the court below entered the judgment here complained of. The contention on behalf of the plaintiff is that this section applies only after a verdict has been rendered, and that until then the court has no power to enter judgment. There is no such limitation in the words of the section, and it would seem to be absurd that when, upon the statements of the parties to the pleadings, one or the other is entitled to judgment, the court should go through the useless ceremony of submitting to a jury immaterial issues in order to enter a judgment upon the pleadings without regard to the verdict."